Filed 10/14/15 (unmodified opn. attached)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S055856 |
| v. | ) | |
| | ) | |
| ORLANDO GENE ROMERO and | ) | |
| CHRISTOPHER SELF, | ) | |
| | ) | Riverside County |
| Defendants and Appellants. | ) | Super. Ct. No. CR46579 |
| _____ | ) | |

**MODIFICATION OF OPINION**

THE COURT:

The opinion herein, published at 62 Cal.4th 1, is modified as follows:

1. In 62 Cal.4th at page 42, at the end of part II.B.4.b., a new paragraph is added, reading as follows:

To the extent Romero also claims that CALJIC No. 3.02 improperly allowed the jury to find that he aided and abetted certain nontarget offenses other than the murders — i.e., attempted murder, aggravated mayhem, and shooting at an occupied vehicle — based on the doctrine of natural and probable consequences, we reject the claim. It appears in his view the instruction erroneously relieved the jury of the duty to determine whether he actually had the intent to encourage or facilitate these nontarget offenses. He is mistaken. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense . . . . (*People v. Chiu*, *supra*, 59 Cal.4th at p. 165.) 'Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' (*Id.* at p. 164.)

2. In 62 Cal.4th at page 58, the final sentence of part II.C.6 is deleted.

1

Substitute this new sentence reading:  We further conclude this error and any assumed error are not prejudicial when considered cumulatively, nor have defendants otherwise demonstrated that they were denied a fair trial.

This modification does not change the judgment.

The petitions for rehearing are denied.

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S055856 |
| v. | ) | |
| | ) | |
| ORLANDO GENE ROMERO and | ) | |
| CHRISTOPHER SELF, | ) | |
| | ) | Riverside County |
| Defendants and Appellants. | ) | Super. Ct. No. CR46579 |
| _____ | ) | |

Defendants Orlando Gene Romero and Christopher Self were convicted of the first degree murders of Joey Mans, Timothy Jones, and Jose Aragon, the willful, deliberate, and premeditated attempted murders of Kenneth Mills, Paulita Williams, and Randolph Rankins, the attempted robbery of Kenneth Mills and Vicky Ewy, shooting at the vehicle occupied by Kenneth Mills and Ewy, the mayhem of Kenneth Mills, the second degree robberies of William Meredith, Jerry Mills, Sr., Jerry Mills, Jr., and Albert Knoefler, the second degree burglary and vandalism of Magnolia Center Interiors, and receiving stolen property. (Pen. Code,[1] §§ 187, subd. (a), 189, 205, 211, 459, 496, 594, subd. (b)(2), 664.) The juries[2] also found true robbery-murder special-circumstance allegations as to all three murders, two multiple-murder special-circumstance allegations for each murder, and arming enhancement allegations. (§§ 190.2, subd. (a)(3), (17)(i), 12022,

---

[1] All further undesignated statutory references are to this code.

[2] Defendants were tried jointly before separate juries.

1

subd. (a)(1).)  Self was also convicted of the willful, deliberate, and premeditated attempted murder and second degree robbery of John Feltenberger and the kidnapping for robbery and second degree robbery of Alfred Steenblock, and the jury found true great bodily injury enhancement allegations as to the crimes against Feltenberger and Kenneth Mills and arming enhancement allegations.  (§§ 187, subd. (a), 209, subd. (b), 211, 664, 12022, subd. (a)(1), 12022.7.)  Romero was also convicted of the kidnapping for robbery and second degree robbery of Robert Greer, the second degree robbery of Roger Beliveau, and receiving stolen property (Feltenberger's ammunition pouch), and the jury found true arming enhancement allegations.  (§§ 209, subd. (b), 211, 496, 12022, subd. (a)(1).)  The juries returned death verdicts, and the trial court entered judgments of death.  This appeal is automatic.  (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)  For the reasons that follow we reverse Self's conviction and sentence for Knoefler's robbery, vacate five multiple-murder special-circumstance findings for each defendant, and otherwise affirm the judgments.

## I.  FACTS

### A.    Guilt Phase

#### 1.      Prosecution case

In 1992, defendants and brothers Romero and Self[3] engaged in a two-month crime spree.  They were joined at times by Jose Munoz, who pled guilty and testified against defendants at trial,[4] and Daniel Chavez, whose case was severed before trial.  Defendants were also implicated by their recorded statements to police, which were played for the jury, and by witness identification and physical evidence.

---

[3]    At some point Self changed his last name from Romero to that of their stepfather, Phillip Self.

[4]    In exchange for Munoz's testimony and agreement to plead guilty to the first degree murders of Aragon, Mans, and Jones, the attempted premeditated murder of Feltenberger, the robberies of Feltenberger, Knoefler, and Meredith, and the attempted robbery of Kenneth Mills and Ewy, the prosecutor agreed to seek a sentence of 51 years to life in prison for Munoz, and request Munoz serve his sentence out of state.

2

### a. *Meredith robbery*

On October 8, 1992, about 10:30 p.m., defendants and Munoz robbed William Meredith and stole his 1991 Nissan Pathfinder. They subsequently made a withdrawal and a charge on Meredith's Visa card.

### b. *Mans and Jones murders*

In the early hours of October 12, 1992, defendants, Munoz, and Chavez noticed Timothy Jones and his best friend Joey Mans in a car at a hilltop area near Lake Mathews. Romero and Munoz ordered the men out of the car at gunpoint. Romero told Mans to relax and everything would be all right, and had Mans lie down on the ground next to Jones. Romero told Chavez to "[s]hoot," adding, "[s]omething like this." Romero shot Mans in the back, killing him. He attempted to shoot Jones, but the gun malfunctioned. Jones got up and ran down the hill, and defendants ran after him. Self beat Jones with his fists and a pipe and shot him four times, killing him. Defendants stole the victims' car keys and a box containing boots, shoes, magazines, and toiletries.

### c. *Kenneth Mills and Ewy assault*

On October 22, 1992, between 11:30 p.m. and midnight, Kenneth Mills and his girlfriend Vicky Ewy took a drive to look at the lightning. Defendants and Munoz pulled up beside them and Self shot Mills, who was driving, in the face. Defendants continued to chase them until Mills turned onto a golf cart path. Mills permanently lost vision in his right eye.

### d. *Williams and Rankins attempted murders*

In the early morning hours of October 26, 1992, Randolph Rankins was unsuccessful in purchasing methamphetamine for defendants and Munoz. Romero said he would "be seeing" Rankins later; defendants and Munoz then left. Romero told Self and Munoz that if Rankins did not refund their money, they should "take him out," and Self agreed. About an hour later, Rankins was with acquaintance Paulita Williams in her car at the intersection of Alexander Street and Myron Street in Riverside County.

3

Williams was trying to back up to make a turn she had missed.  Defendants' car appeared and blocked Williams's car, and Munoz and Self got out.  As Munoz began shooting, Rankins escaped from the car.  The bullets struck Williams in her left side and shattered the driver and passenger windows.  Self, who appeared to be smiling, began stabbing Williams in the arm.  Munoz pushed Self away and shot Williams.  Williams suffered a punctured lung and three cuts on her hand and arm, including a nine-inch-long gash on her arm that required about 80 stitches.  One of the bullets left a deep gash on her back about six inches long and an inch and a half wide, and pellets were embedded in her spine, shoulder bone, and muscle.  Williams still felt the pellets constantly and could not bear weight on her shoulders.

### e. *Magnolia Center Interiors burglary and vandalism*

On the night of November 13, 1992, defendants broke into Magnolia Center Interiors in Riverside.  File drawers were emptied, fire extinguishers were sprayed on fabric samples, and glue was sprayed into computers, telephones, fax machines, and calculators.  Words similar to "You're going to die" were written on a sonogram picture of the shop owner's unborn son and the picture was stabbed with a sharp object.  The words "Just when you thought" and the number "666" were written on the wall and the words "Now you die" were written in the bathroom.  The store safe was closed but its combination lock was missing and its hinges had been tampered with.  A pair of bolt cutters was found by the safe and several screwdrivers and chisels had been "beaten flat," as though "somebody was pounding" on the hinges "trying to pull the hinge pins out."  A set of unlabeled master keys to offices around the city and a set of keys to the shop van were taken, along with personal objects.

### f. *Steenblock kidnapping and robbery*

On November 18, 1992, about 1:15 p.m., Alfred Steenblock was eating lunch in his 1992 Pontiac Grand Prix parked at the Mission Grove Plaza shopping center in Riverside.

Self approached Steenblock, pointed a gun at his face, and told him to move over. Self drove Steenblock to an empty field. Another car followed and parked behind them, and two men, including Chavez, got out. Self demanded Steenblock's wallet, took out his automated teller machine (ATM) card, and asked for his personal identification number (PIN). He also took about $80 in cash and Steenblock's watch. The men instructed Steenblock to get out of the car, walk into the field, and stay there for an hour, and then left, taking Steenblock's car. Steenblock's partially stripped car was later recovered in a rural area of Mead Valley.

### g. *Knoefler robbery*

On November 20, 1992, about 3:30 p.m., Albert Knoefler was tending beehives at Markham Street and Washington Street in Riverside County. Parked nearby was his 1987 pickup truck. Romero approached Knoefler, struck up a conversation about the bees, and walked around the bee yard. Romero then brandished what appeared to be a sawed-off shotgun and demanded the keys to Knoefler's truck. Munoz appeared wearing a ski mask. Romero said he needed money for gas, and Knoefler handed him about $50. The men left in the truck. The truck was stripped and found several weeks later.

### h. *Robbery of Jerry Mills, Sr., and Jerry Mills, Jr.*

On November 21, 1992, about 12:45 p.m., Jerry Mills, Sr., and his 15-year-old son, Jerry Mills, Jr., were engaged in target practice shooting about two miles south of the Perris Airport in Riverside County. A gray hatchback pulled up and Self pointed a shotgun at Mills. Defendants and Chavez got out of the hatchback and took from Mills his pickup truck, along with a Colt Gold Cup .45-caliber semiautomatic pistol, a Ruger .22-caliber semiautomatic pistol, a Ruger .22-caliber convertible Western-style single action revolver, a Ruger 10/22 semiautomatic rifle with a dark mahogany stock and a scope, a "banana clip" or curved 25-round magazine, a 10-round magazine for the rifle,

5

an ammunition box, toolbox, and about $150. Mills's abandoned truck was found a half-hour later.

### i. Aragon murder

On November 25, 1992, 22-year-old Jose Aragon was practicing motorcycle stunts in San Timoteo Canyon in Riverside County. Defendants and Munoz engaged Aragon in friendly conversation and, after Aragon showed them some stunts, Self shot him. Romero picked Aragon up and asked: "How does it feel to get shot? Does it burn?" Romero placed Aragon in the bed of his (Aragon's) pickup truck. Munoz asked him for his keys and wallet, and Self told Aragon to tell him his ATM access code or he would kill him. After Aragon gave Self the code, Self put his gun to Aragon's ribs and fired repeatedly. Aragon was shot 11 times; all wounds were inflicted before and contributed to his death.

Defendants and Munoz stole Aragon's wallet, toolbox, and Craftsman socket set. As they drove off, Self laughed and said, "Oh, wow, you should have seen the hole it made." Self made a circle with his fingers about two and a half inches in diameter. Defendants and Munoz withdrew $300 from Aragon's bank account at two different ATM's and ate lunch at Coco's restaurant.

Aragon's body was discovered later that afternoon by a 10-year-old boy. Two red plastic fragments consistent with a 20-gauge sabot shotgun round manufactured by BRI were found in his body. Jose Munoz was videotaped making one of the ATM withdrawals, later arrested, and gave a statement to police that led to defendants' arrest.

### j. Feltenberger attempted murder and robbery

On November 30, 1992, about 4:00 a.m., off-duty Ontario Police Sergeant John Feltenberger was driving his 1991 red Geo Metro coupe in Moreno Valley near his home. He was not armed or in uniform. A white car appeared and drove parallel to Feltenberger, matching his speed each time he slowed down or accelerated. Feltenberger

6

thought it might be his newspaper carrier, and pulled to the side of the road; the white car stopped beside him. Self got out of the passenger side of the white car carrying a silver or chrome sawed-off shotgun. He opened the driver's door and demanded Feltenberger get out of the car and give Self his wallet. The wallet was in Feltenberger's back pocket, but he said it was in the back of his car. The men switched positions so Feltenberger was outside facing the car. Feltenberger ignored Self's demands for the wallet and, with his hands raised, started to back away from Self. When Feltenberger was about 10 feet away, he heard a voice from the white car in which Munoz was sitting say, "Kill him." Feltenberger said, "Nobody has to get hurt," and threw the wallet to Self. The voice inside the car again said, "Kill him." Self said, "I ought to shoot you," and shot Feltenberger in the chest. Feltenberger collapsed and Self drove off in the Geo Metro. Feltenberger was bleeding and his lung had collapsed, but he managed to reach a neighbor's house and obtain aid. At the hospital Riverside County Sheriff's Deputy David Green saw medical personnel remove a small piece of red plastic measuring about two inches by one inch from Feltenberger's right arm. In his "thousands" of times firing a shotgun, Green had never seen a similar object in a round. A different deputy sheriff saw a red plastic object under Feltenberger's shirt in his chest area. Feltenberger was in intensive care for three days and hospitalized for about 10 days.

Both the red material observed by the deputies and the red sabot material found in Aragon's body were identified at trial as consistent with a BRI 20-gauge sabot shotgun round. The pathologist who performed Aragon's autopsy testified that injuries from sabot rounds are uncommon.

In his statement to police, Self admitted shooting Feltenberger with a 20-gauge sawed-off shotgun and taking his car. Feltenberger testified that when his car was returned to him in January 1993, it was missing his flashlight, ammunition pouch, and axe. In Romero's statement to police he admitted that the "pouch" he had had come from the Feltenberger incident. Munoz testified he and Self found the ammunition pouch in

7

Feltenberger's car, and that Romero later "took it" because it fit the magazines for his .45-caliber weapon.

### k. *Greer kidnapping and robbery*

On December 5, 1992, about 8:00 p.m., Robert Greer withdrew cash from an ATM at the corner of Alessandro Boulevard and Trautwein Road in Riverside. As he returned to his 1992 Honda Accord EX, Romero, wearing a ski mask, brandished a gun and told Greer to throw him his car keys. Romero ordered Greer to sit on the passenger side of the car. As Romero drove, he kept the gun pointed at Greer. The gun was a dull gray or silver and appeared to be a semiautomatic, "like a .45" caliber. They drove about nine miles to a remote area in Mead Valley. Romero took Greer's car, about $40, and Greer's driver's license and ATM card. He asked for Greer's PIN number, and $800 was later withdrawn from Greer's bank account. Greer walked about two miles to a house where he contacted police.

### l. *Beliveau robbery*

On December 7, 1992, about 12:45 a.m., Roger Beliveau was in an unlit restroom at Hunt Park in Riverside. Romero approached him and Beliveau heard the sound of a round being chambered in a semiautomatic pistol. Romero told Beliveau to give him his car keys and he would not get hurt. He then told Beliveau to wait in the restroom for five minutes and drove off in Beliveau's maroon 1978 Ford LTD. Romero stopped at the end of the parking lot, where another man threw trash bags into the back of the car; the two men then left. Police later found Beliveau's ransacked car in a shopping center at Alessandro Boulevard and Trautwein Road in Riverside.

### m. *Romero's escape attempt*

In April 1994 Arthur Dicken was housed in a Riverside jail cell next to a cell housing Romero and Michael Aragon (who was no relation to murder victim Jose Aragon). During the nighttime between April 1 and April 14, 1994, Dicken observed

8

Romero and Aragon cutting the two bottom bars of their cell door with a hacksaw blade. Romero told Dicken he was planning to escape by taking the nighttime deputy hostage, threatening him with a shank, and leaving the jail. Dicken observed Romero with a four- to six-inch-long sharpened metal piece or shank and Aragon with a makeshift spear. Romero and Aragon hid the damage to the bars by taping and painting them. Jail personnel learned of the planned escape and Romero and Aragon were moved to a different cell. Inspection of the two bars revealed they were completely cut through and could be removed by hand to create a space large enough for an inmate to leave the cell. A weapon was found in the cell.

### n. Self's escape attempt

On December 16, 1994, about 1:00 a.m., Riverside County Deputy Sheriff Scott Collins noticed a car parked near the jail in a lot reserved for authorized vehicles. The window for the ground floor cell in which Self was incarcerated was visible from the car's location. When the driver, Romero's girlfriend, Sonia Alvarez, was asked what she was doing there she gave several different explanations and was arrested. Sheriff's deputies inspected Self's cell and found gouges in and around the rear window and concrete chips on his bed below. A welded bracket from a cage around Self's television set had been removed and was found under the television. Self had an inch-long cut on one finger and redness on both hands.

### 2. Defense case

Defendants rested without presenting evidence.

9

**B.     Penalty Phase**

    **1.     Prosecution case**

        *a.  Victim impact evidence*[5]

          *(1)  Jose Aragon*

Lydia Roybal-Aragon, Jose Aragon's stepmother, married Jose's father when Jose was about 13. The family lived in Albuquerque, New Mexico. In 1985, they moved to Redlands, California.

Lydia described Jose as a "kind," "gentle soul" who "never hurt anybody." At the time of his death, Jose was a 22-year-old senior engineering student at California State Polytechnic University. He was a dedicated student and studied constantly. Jose's favorite activity was motorcycle riding, and he had received numerous competition trophies. Jose was close to his siblings.

Lydia described how the family learned of Jose's murder and its effect on them. After Jose's death, his father and brothers Steven and Carlos isolated themselves and rarely interacted with the family. His father lost interest in his job, about which he had previously been passionate, and Steven suffered from insomnia. Jose's younger sister Laura started to misbehave and had difficulty completing her schoolwork.

Leighette Hopkins, Jose's friend since high school, described Jose as a calm and friendly person who made people laugh. He was a bright and hard-working student who took time to help Leighette study for a chemistry test the night before he died.

Stephanie Aragon, Jose's younger sister, testified that when their parents divorced Jose and Steven moved to California with their father. Stephanie, who was then seven years old, stayed in New Mexico with her mother. Stephanie saw Jose about four times a year. Jose was quiet and shy and protected her.

---

[5]     Because some witnesses and victims shared surnames, for clarity we refer to the victims and witnesses by their first names in this portion of the opinion.

*(2) Joey Mans*

Catherine Mans, Joey Mans's mother, testified he was her only son and had five sisters. He was 26 years old when he died. Joey was generous, polite, smart, and protective of his family. He was mechanically inclined and could fix anything. Catherine did not attend Joey's funeral because she did not "want to see [her] son in a box," and had never visited his grave. She "almost died [her]self," felt angry all the time, quit her job, and had been prescribed tranquilizers.

Angela Mans, younger than Joey by six years, testified her brother was kind and gullible. He loved to draw and play guitar and work on cars. When Angela saw Joey in his casket, he "looked so scared," so she knew he was afraid when he died. Because of fear she would be similarly attacked, for two months she did not leave her home except to go to work, and four years later at the time of her testimony she still did not go out at night. Their father had not celebrated Christmas in three years because the family was not "complete." Every year on Joey's birthday, Angela and other family members brought to his grave and released a number of balloons corresponding to what his age would have been.

*(3) Timothy Jones*

James Jones, Timothy Jones's father, testified that Timmy had a brother, a sister, and two stepbrothers. He was 22 years old when he died. Timmy was the "[m]ost wonderful kid in the world," who was kind and generous and "would do anything for you" and "didn't hate anyone." James could not understand "how they could take his life." James had visited Timmy the night before he died. "[L]ike always," Timmy told James, "I love you, Pop," and hugged him goodbye. James next saw Timmy in the funeral parlor and wished he could have died instead of him.

Timmy's parents divorced when Timmy was about seven years old and the children lived with their father. Shortly after Timmy's death, his mother had a stroke and died about two years later.

11

### b. *Unadjudicated criminal activity*

#### (1) *Romero*

On September 22, 1993, Rodney Medeiros, who was incarcerated with Romero, received food from the commissary. Romero and other inmates demanded Medeiros give them his food and beat him when he refused. He was treated for a week in the medical ward.

On October 6, 1993, about 9:20 p.m., inmate Walter Jutras was sleeping in his cell. He awoke when Romero put his knee on the back of his neck. Romero and another inmate repeatedly struck him.

On October 27, 1993, Riverside County Sheriff's Deputy George Munoz removed Romero from his jail cell and told him to empty his pockets. Romero removed a sharpened toothbrush that could be used as a weapon. In a box of his belongings Munoz found a broken hairbrush handle that appeared to have been sharpened.

On September 3, 1994, and October 29, 1994, shanks were found in Romero's one-man cell.

On June 12, 1994, Romero lured fellow Riverside jail inmate Olen Thibedeau to his cell and stabbed him in the stomach with a spear more than four feet long. Thibedeau was facing charges of child molestation and was later convicted of those crimes.

On February 8, 1995, Romero visited with Stephanie Stinson, the mother of his son, and their conversation was recorded and a portion played for the jury. Romero said: "I don't like violence. I try to avoid it. But when they stick a child molester next door to me [and] expect me not to do something, I'll be his friend, talk to him real nice, bring him close to the door, and then make him a little spear about this long, about this skinny, that's real hard and won't bend. You put a pencil at the end of it and strips of wood. [¶] . . . [¶] Stick him in his neck."

Between October 1994 and March 1995, Romero squirted urine from a bottle on inmate Tyreid Hodges, who had been charged with child molestation, stepped on a carton

12

of feces splattering them on Hodges, and "squished" a shampoo bottle containing urine, causing it to hit Hodges.  He also threw a hairbrush at Hodges.

### (2)  Self

Milton Solorzano attended high school with Self.  On May 22, 1992, while Solorzano was standing in the lunch line, Self charged toward him.  Solorzano moved out of the way and Self hit his head on the wall.  Solorzano grabbed Self and held him in a headlock for about two minutes until a teacher came.  Self repeatedly tried to hit Solorzano with his fist and said:  "I'm going to get you.  Let me go."

On June 24, 1993, Self and another inmate approached inmate Oswaldo Vazquez and asked him to massage their backs.  Vazquez refused.  Self threatened Vazquez with a pencil and said he would stab Vazquez in the neck if he did not give Self a massage.  Vazquez massaged Self's back.  Self then told Vazquez to suck his penis.  Vazquez declined, and Self and another inmate beat him while a third inmate stood guard.  Vazquez had a scar near his eye as a result of the attack.

On September 19, 1993, a shank was found in Self's box of personal belongings.  On November 25, 1994, three shanks were found in Self's one-man cell.

On May 30, 1994, Self punched inmate Mario Garcia Pescador in the mouth and left eye.  One or two other inmates joined Self.  The victim received six stitches above his eye.

On June 5, 1994, about 1:00 a.m., Riverside County Sheriff's Deputy Manuel Correa responded to inmate Jacob Aramburo's screams for help.  Aramburo was sobbing on the floor of his cell in a fetal position.  He had a cut on the back of his head, scrapes on his back and chest, and pain in his left shoulder and lower back, and the right side of his face was swollen.  Aramburo shared the cell with other inmates including Self.  Self's knuckles were red and he had a fresh cut on one knuckle.

13

On July 22, 1994, Riverside County Sheriff's Deputy Alfonso Campa responded to calls for help from inmate Richard Reyes. Reyes was missing several teeth and bleeding from his lip and gum, had red marks on his face, and looked scared. Campa examined the other inmates in Reyes's cell. Self was bleeding from a puncture wound on one of his knuckles and his other knuckles were red. None of the other inmates had marks on their hands. On July 24, 1994, Self told his mother in a recorded conversation that was played for the jury that he had "busted out" an inmate's "two teeth."

### 2. Defense case

#### a. Both defendants

Maria Self, defendants' mother, testified that defendants' biological father was Orlando Romero, and she was married to their stepfather, Phillip Self. Maria was 17 in 1968 when she married 22-year-old Orlando. They were married for six years and had four sons; she was pregnant with Self when she filed for divorce.

Maria never smoked, drank alcohol, or used drugs when she was pregnant with defendants. Orlando never worked. He was physically abusive to Maria, and once put a gun to her face and said he should kill her. On another occasion he threatened the entire family by filling the house with thick smoke and refusing to let them leave. Both Orlando and Maria had frequent affairs. At one point Maria called 911 and told the dispatcher she was "going to kill them all because [she] couldn't handle them." On cross-examination she said that although she spoke to the dispatcher for over two minutes, and cried hysterically that she was going to kill all of her children, no police officer ever came to her house to investigate.

After Maria left Orlando, she and her sons moved to Modesto for about four years. Maria did not work, and she abused alcohol and drugs, including methamphetamine, in front of the children. She was also physically and verbally abusive to the boys, and never hugged them or told them she loved them. When Self was about two years old, she

14

slashed his face and the children were removed from her custody. About a year later, the children were returned to her. On cross-examination, Maria said she had struck Self with a broken fly swatter, he had one cut, and she did not seek medical attention for him. Maria agreed with the prosecutor that she had been distraught and told a counselor at the department of mental health she was "in a bad way" and "needed somebody to help [her] with the children." The following day her children were placed with relatives.

At some point the family left Modesto and moved to Turlock for about a year. Maria continued to drink and she also used methamphetamine and LSD. The family then moved to Stockton, where they lived with a heroin addict and dealer. Romero was in school, but she never visited the school or asked about his homework. Romero closely resembled his biological father, and Maria frequently reminded him of this circumstance and said that she hated his father.

The family then returned to Riverside. Maria continued to use drugs and did not monitor the children's school work. Between the time Maria married Orlando and when she married Phillip Self, she had been in about 10 relationships. After her divorce from Orlando the family moved frequently, living in 10 or 11 different places.

On cross-examination Maria agreed with the prosecutor that shortly after returning to Riverside she met and moved in with her current husband, Phillip Self. Romero was about eight years old and Self about five years old. Phillip was very good to the boys. He took them fishing, showed them how to change a tire, and treated them as his own children. Maria agreed with the prosecutor that Phillip was "the best thing that ever happened to [her]," and said that when she would try to abuse alcohol or drugs, "he wouldn't let [her]." Maria and Phillip had two girls together, and Maria had tried to be a good parent to them.

When Romero was 14, he asked to live with his father. Maria allowed him to go, but believed her "baby [was] gone . . . into somebody's hands who really doesn't care about him." When Romero became involved with drugs, Maria told him she would help

15

him in any way she could to get off drugs. She tried to arrange for him to go to the treatment program Teen Challenge, but there was a long waiting list.

When Self was about 14 or 15 years old he lived with Maria's niece for about four months and then came home; at some point he also lived with his father. Self began using drugs and alcohol. Maria sent him to a Chino drug rehabilitation center for two weeks. Afterward, Self did "much better." He was home-schooled and received good grades. Self relapsed, however. Maria had two small girls in the house and did not want them to see their brothers abusing these substances, so she told Self he had to leave and sent him to live with her friend Charlene. Self later lived with Maria's mother. Maria testified that Self "does beautiful artwork."

Maria loved defendants. Since their arrest three and a half years earlier, Maria had spent much of her time crying and praying.

Anthony Self, defendants' older brother, testified he had enlisted in the Army at the age of 18 and reenlisted for another four years when he was 22 years old. He was a combat engineer and paratrooper in the 27th Engineer Battalion at Fort Bragg, cleared mine fields during Desert Storm, and supervised other soldiers.

When Anthony was about eight years old, he and his family lived with Bobby Guzman. Guzman once disciplined Self by making him stand in a corner for two hours with soiled underwear on his head. At some point Maria married Phillip Self, whom the boys liked, and whom Anthony considered his father.

Anthony and his brothers would frequently send Self to fight the next-door neighbor to "see what he could take." Anthony experimented with drugs in high school and once gave Self heroin when he was in elementary school. Maria and Phillip were unaware of his drug use. On cross-examination Anthony agreed he had never mentioned giving Self heroin to any of the investigators he had spoken to before trial. Maria told the boys to avoid drugs and both she and Phillip would have been very upset if they had learned Anthony had been drinking alcohol in high school.

16

When the boys upset Maria she would "lash out at us with whatever she had in her hand," such as a fly swatter or broom. She once threw a knife at Anthony, hitting him with the handle. On cross-examination Anthony testified it was important to Maria that the boys did well in school and she wanted them to attend school and complete their homework.

Anthony used the last name Self because his biological father was "really never any part of our lives" and did not provide any financial support. He said, "We lived pretty much in poverty with my mother raising us." When Phillip Self joined the family he was very good to the boys, taking them fishing and supporting them and showing Anthony how to work on cars.

### b. Romero

Carmen Burrola, Maria Self's sister and Romero's aunt, testified that when Romero was in about the second grade, he and his brother Anthony stayed with her and her husband and daughters for about two years because Maria had a "nervous breakdown." Romero was kind and polite. Burrola and her husband took the boys to Disneyland and other amusement parks and to the mountains. Burrola gave the boys chores to do, tried to teach them right from wrong, and gave them advice on how to navigate life's problems.

Burrola had never seen Maria abuse the boys. Burrola knew Orlando, Romero's biological father, and characterized home life with him and Maria as "[a]wful." She recalled Orlando "drunk, . . . just lying there, not doing nothing." Phillip Self was a good man who was " [v]ery patient" with the boys and very good to Maria. Burrola was very sad and surprised when she heard Romero was charged with murder because he "was always a good boy" and "very respectful."

Mona Suzette Quezada, Romero's cousin, had worked for the Riverside Transit Agency for eight years. She was 10 years older than Romero and grew up with him. She described him as a quiet child. Their grandparents lived in the area on a small farm. At

17

times when she was 10 to 12 years old, she and her grandparents would pick up Romero and his siblings either because they were not being taken care of or because Maria was upset with Romero's father. On those occasions Romero and his siblings often did not have "decent food to eat," and sometimes were without electricity. Her grandmother was very good to Romero and his siblings when they were at her house. Quezada was very surprised when she heard Romero was charged with murder because it "was totally out of character."

Margaret Lopez, Romero's aunt and godmother, took care of Romero for two months when he was about a year and a half old. She did not have a lot of contact with Romero when he was a child. When he was a teenager Romero visited her whenever he could and was respectful. She was shocked when she heard he was charged with murder because he was a "good kid" and "wouldn't do what they are saying."

Corinna Leon, Romero's cousin, took care of him frequently when he was young. As a teenager Romero was quiet and kind and interacted well with her children. At some point as a teenager he had a girlfriend and a baby of his own and Corinna saw him less frequently. When Romero's mother Maria returned from "up north," she was not "taking care of the boys," although Corinna could not recall any particular incident when they were not fed or clothed.

Catherine Mejia, Romero's cousin, lived with Romero for about three months in 1990. Romero was quiet, happy, and nice.

Christine Arrabito testified that she had attended school with Romero from elementary through high school. After high school Romero lived with Arrabito and her family in Perris for about a month. Later that same year he lived with her and her family in Pacifica for about five months, saying he "really wanted to . . . change" and wanted a "fresh start." Although he held various jobs, he did not pay his share of the rent or phone bill and was asked to leave. On cross-examination Arrabito did not recall telling an investigator that Romero said he and his friends would beat up people who "piss[ed] him

18

off." She relayed Romero's description in high school of watching the drivers of expensive cars for a long period of time before stealing their cars. She believed her family had given Romero a chance in Pacifica and he had misused it and taken advantage of them. After that she did not want anything to do with him.

Janice Babish, Arrabito's mother, testified that Romero came to live with them in Pacifica because he "felt like he needed to turn his life around" and thought it would help to leave the Riverside area. On cross-examination Babish said Romero would claim to be still working at a job after he had been fired so Babish would think he was still earning money. When he left their home he said he would pay the family back for his phone bill but never did.

Sheila Torres, Romero's cousin and a California deputy labor commissioner, was two years older than Romero's mother. Once when she and her grandparents took groceries over to Romero's house, his father Orlando was passed out in the house. Her cousins were toddlers and were outside playing in a field.

Torres said at one point Romero's mother Maria Self came to live with her while Romero lived with another family. For about a year Maria occasionally dated a heroin dealer, Henry Alvarado. Torres was upset and spoke to Maria because Alvarado "had no redeeming qualities." Torres also witnessed Maria throw objects at her sons. She commented, "it seemed like [Maria] was either riding them for something or not paying any attention to them at all." Maria "was always comparing [Romero] to his father" and "telling him that he wouldn't amount to anything."

Torres also said she had a brother who committed suicide, a niece who was beaten to death, and a great-uncle, whom neither she nor defendants had met, who was convicted of murder.

### c. *Self*

Sheriff's Deputy John Bianco worked at the Robert Presley Detention Center, where Self was housed in a cell by himself. For two hours a day he could leave the cell and use art supplies. The jury was shown several pieces of Self's artwork.

Margaret Louie, Self's high school art teacher, testified that Self had voluntarily participated in creating a mural to honor an art teacher who had died, and had drawn a cover for a school literary magazine. She described Self as "[v]ery talented, very motivated," and someone who always volunteered.

### 3. Rebuttal

#### a. *Both defendants*

Robin Levinson, a defense private investigator, conducted a taped interview of Maria Self on June 8, 1993, and had a transcript prepared. When Maria was asked if she used drugs around her children, she said she had never used drugs or been drunk in front of them but rather always tried to shield them.

Levinson had also interviewed Christine Arrabito. Arrabito said Romero told her he and his friends would beat up individuals who made them angry, but she never saw this quality in him and thought it was "all talk."

#### b. *Romero*

Maria Self, defendants' mother, testified she did not recall telling an investigator during a taped interview that Romero's "attitude was very bad," "he never wanted to take responsibility for anything that he did," and he did poorly in school. When asked if it was true Romero never wanted to take responsibility for his actions, Maria replied, "Well, he may have not liked to, no, but sometimes he did." On cross-examination she agreed with defense counsel that if something had been Romero's fault, she would "just beat him."

Robin Levinson testified Maria Self had said during her taped interview: "His attitude was very bad. It was like he never wanted to take responsibility for anything that

20

he did. It was always somebody else's fault. He denied things that would be in front of somebody's face and he would still deny it. He didn't want to get up in the morning. He didn't do well in school. He did very poorly." On cross-examination, Levinson noted Maria had also said Romero "had very low self-esteem, even though he was the best looking kid on the block."

## II. DISCUSSION[6]

### A.   Pretrial Issues

#### 1.   Challenges to juror questionnaire

Self contends that asking each prospective juror to identify on the juror questionnaire his or her race and ethnic background led to the improper discharge of prospective jurors based on race and ethnicity and resulted in the selection of a biased jury that violated Self's right to a representative cross-section of the community.[7] Before

---

**6**    Before turning to defendants' claims, we address three preliminary matters. First, defendants each make a blanket statement they join in all issues raised by each other that may accrue to their benefit. We have recently strongly disapproved of this practice. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364 (*Bryant, Smith and Wheeler*). As in *Bryant, Smith and Wheeler*, however, we will assume defendants have complied with California Rules of Court, rules 8.630(a) and 8.200(a)(5), in order to avoid further delay. (*Bryant, Smith and Wheeler*, at p. 364.)

Second, "as to many claims defendants allege for the first time that the error complained of violated their federal constitutional rights. To the extent that in doing so defendants have raised only a new constitutional 'gloss' on claims preserved below, that new aspect of the claims is not forfeited. However, '[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory . . . .' " (*Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 364.)

Finally, Romero's first "claim" presents no claim of error but is simply a lengthy exegesis on how "any substantial error could have affected the penalty verdict." Absent reference to a claim of error, it is difficult to meaningfully assess or respond to his discussion. Where relevant, we invoke the proper standard of prejudice for that asserted error, and nothing in Romero's discussion persuades us to revisit these standards.

**7**    Question 1.D. read: "Your race and ethnic origin: _____."

21

jury selection defendants unsuccessfully objected to the use of a juror questionnaire because in their view it would be used by the prosecutor to strike any prospective juror expressing "even a minimal reservation about imposing the death penalty." Once the questionnaire was drafted, Self objected to a question regarding the then recent O.J. Simpson trial. Self did not object to the question regarding the prospective juror's race and ethnic background, and the claim is therefore forfeited.

Self further contends use of the jury questionnaire to dismiss 56 prospective jurors was unconstitutional. Several of these prospective jurors were questioned on voir dire, and in any event, Self stipulated to the dismissal of all of them and the claim is therefore forfeited. Although the trial court at times commented on the prospective jurors who had been stipulated for excusal, these statements were not findings. As we have explained: "A court may allow counsel to prescreen juror questionnaires and stipulate to juror dismissals. [Citations.] When prospective jurors are formally dismissed pursuant to stipulation rather than cause, the trial court makes no findings, and we have nothing we can review. [Citation.] Consequently, a stipulation to the excusal of jurors forfeits any subsequent objection to their omission from the jury pool." (*People v. Duff* (2014) 58 Cal.4th 527, 540; see *People v. Booker* (2011) 51 Cal.4th 141, 159 ["We previously have barred belated challenges to stipulated excusals of prospective jurors"].) Unlike in *People v. Stewart* (2004) 33 Cal.4th 425, 444–445, 448, on which Self relies, the prospective jurors here were not excused over Self's objection but rather with his consent.

### 2. Asserted prosecutorial misconduct

#### a. Assertedly racially biased voir dire

Self contends during voir dire the prosecutor improperly and repeatedly asked Hispanic prospective jurors more "probing and detailed questions" than he asked Caucasian prospective jurors in a successful effort to eliminate "all eligible, qualified

Hispanic prospective jurors from the final jury pool." As Self concedes, he did not object below on the ground the prosecutor's voir dire was racially biased and the claim is therefore forfeited. Such a failure "deprives the trial court of the opportunity" to create a record and to "correct potential error in the first instance." (*People v. Lewis* (2008) 43 Cal.4th 415, 481; *id*. at pp. 481–482 [failure to press for a ruling on a *Wheeler*[8] motion forfeits the issue on appeal]; see *People v. Richardson* (2008) 43 Cal.4th 959, 984 [failure to make a *Wheeler* motion at trial "forfeits the issue on appeal"]; *People v. Gallego* (1990) 52 Cal.3d 115, 166 [no error appears when the defendant "failed even to raise a *Wheeler* claim, let alone establish a prima facie case of misuse of peremptory challenges"].) Contrary to Self's assertion, nothing in *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 244 (disapproved in *People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4), which concerned a litigant's claim of *judicial* partiality for the first time on appeal, compels a different result.

Self further contends in his reply brief that trial counsel was ineffective for failing to object to the asserted misconduct. "Obvious reasons of fairness militate against consideration of an issue raised initially in [a] reply brief . . . ." (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.) Moreover, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502 (*Hillhouse*).) Here, because no prosecutorial misconduct claim was raised below, we have no record—such as the prosecutor's reasons for the manner in which any particular prospective juror was questioned—on which we can assess Self's claim. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [ineffective assistance of counsel claims are generally properly decided in a habeas corpus proceeding rather than on appeal].)

---

**8**    *People v. Wheeler* (1978) 22 Cal.3d 258.

## b. *Assertedly misleading comments about mitigation*

Self contends the prosecutor misrepresented the nature of mitigating evidence during voir dire. We disagree.

The prosecutor said to one group of prospective jurors: "You may hear evidence in mitigation, things, perhaps the defendant was a war hero. Perhaps he saved his platoon in the Persian Gulf and received a Silver Star. Perhaps he once pulled a family from a burning car. Perhaps he once gave bone marrow in a transplant so that a child could survive. Perhaps you may hear evidence that would make you have sympathy for him, all of which you can consider in making your [penalty] decision. And there is only one decision to make when you are in the penalty phase, that is between life without parole or death. There is no other option in the penalty phase." He made similar comments on other occasions, at times using hypothetical examples of Self being a scout leader or soccer or Little League coach and having a positive effect on young people.

Defense counsel said to one group of prospective jurors: "[W]e would present mitigating factors, things that we would want you to consider in terms of making this decision, and those mitigating factors can be anything. There ha[ve] been previous examples given by [the prosecutor] of . . . doing a heroic act, for example, or saving somebody from a burning car, a burning building, providing a bone marrow transplant. What I am telling you is, I don't want you to have any preconceived notion as to what mitigating factors might be present. If the only people that deserve life without parole would be heroes, nobody would probably receive it. Do you follow me?" He informed a different group of prospective jurors "[m]itigating factors . . . can be anything positive" about Self and another "[m]itigating factors are anything that may tend to mitigate against what took place" including "[p]ositive things about" Self.

At the end of the penalty phase the trial court instructed the jury that a "mitigating circumstance is any fact, condition, or event which, as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating

24

circumstance in determining the appropriateness of the death penalty." It further instructed the jury a mitigating circumstance did not have to be proved beyond a reasonable doubt; the jury need not unanimously agree on the presence of a mitigating factor before a juror could consider it; the mitigating circumstances read were merely examples and a juror could "also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty"; a juror could find a mitigating circumstance existed if there was any evidence, however weak, to support it; any mitigating circumstance could outweigh all the aggravating factors; the jury could reject death as a penalty based solely on sympathy or compassion resulting from the mitigating evidence; and the jury could decide even in the absence of any mitigating evidence that the "aggravating evidence is not comparatively substantial enough to warrant death."

Self did not object to the prosecutor's statements or seek an admonition, and no exception to the general rule requiring an objection and request for admonition is applicable. The claim is therefore forfeited. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

It is also meritless. Self contends that the prosecutor's comments were improper because they "permitted the jury to infer that only highly or strongly mitigating evidence would be worthy of consideration in deciding penalty and that [Self] was required to introduce" such evidence "to counter any evidence in aggravation [and] to establish that he did not warrant death." There is no reasonable likelihood the jury so construed the prosecutor's comments. (*People v. Centeno* (2014) 60 Cal.4th 659, 667 ["When attacking the prosecutor's remarks to the jury, the defendant must show" in the context of the whole argument and the instructions there was " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' "].) Here, defense counsel on at least one occasion corrected and clarified the prosecutor's remarks through his own voir dire comments. (*People v. Seaton* (2001) 26

25

Cal.4th 598, 636.) More critically, the trial court's instructions at the end of trial fully informed the jury that it could consider in mitigation any circumstance—no matter how weak the evidence of that circumstance—relating to the case or to Self, and could find life imprisonment without the possibility of parole the appropriate penalty even in the absence of *any* mitigating evidence.

Self further contends that the prosecutor improperly insinuated that Self "bore a heavy burden of proof in order to obtain a sentence less than death." Nothing in the prosecutor's remarks referred to a burden of proof and, once again, the trial court exhaustively instructed the jury on the proper definition and use of mitigating evidence.

In his reply brief Self asserts trial counsel was ineffective for failing to object to the prosecutor's challenged comments. There was no misconduct and therefore no deficiency on counsel's part in failing to object.

### 3. Evidence of Feltenberger's attempted murder

Defendant Romero contends the trial court erred in admitting "gruesome" evidence of Feltenberger's attempted murder to prove Romero received the victim's stolen ammunition pouch. (§ 496; see *ante*, at pp. 6–8.) He asserts his "guilt of the uncontested receiving charge was clear without the attempted-murder testimony, so the error could not have affected that determination," but the testimony was prejudicial at the penalty phase. We disagree.

Before opening statements, the prosecutor moved to have the juries for both defendants hear Feltenberger testify. The trial court admitted Feltenberger's testimony, but directed defense counsel to prepare a limiting instruction, and admonished the prosecutor not to in any way suggest Romero was involved in Feltenberger's shooting. Before Feltenberger testified, the trial court instructed the Romero jury: "You are about to hear evidence in the form of testimony from John Feltenberger. This evidence is not being offered to show that the defendant Orlando Romero is involved in the alleged

26

robbery and attempted murder of Mr. Feltenberger. On the contrary, there will be no evidence provided that Mr. Romero was . . . involved in this incident. Instead, this evidence is being offered as it relates to Count XX, receiving stolen property. You are to consider it solely as it relates [to], one, whether the property was in fact stolen, and, two, whether Mr. Romero had knowledge that the property was stolen." After Feltenberger's testimony, Romero unsuccessfully moved to preclude testimony by other witnesses describing the investigation into the Feltenberger shooting, including the discovery of the red sabot material found in Feltenberger. At the close of the guilt phase the trial court gave Romero's jury a limiting instruction similar to that given before Feltenberger's testimony.

Here Romero asserts only that the evidence was prejudicial at the penalty phase, and we therefore need not consider whether it was properly admitted at the guilt phase. Assuming, therefore, without deciding, that evidence of the details of the attack on Feltenberger was improperly admitted, there is no reasonable possibility a different penalty verdict would have resulted absent admission of this evidence. (See *People v. Brown* (1988) 46 Cal.3d 432, 448.) Both before Feltenberger's testimony and at the close of the guilt phase the trial court instructed the jury the evidence was not being offered to show Romero was involved in the robbery or attempted murder of Feltenberger and there was no evidence Romero was involved in this incident. We presume the jury understood and followed this instruction. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178.) Moreover, other evidence demonstrated Romero's role in the brutal and unprovoked murders of Aragon, Jones, and Mans, and the attempted murders of Kenneth Mills, Williams, and Rankins, as well as his in-custody violence against Medeiros, Jutras, Thibedeau, and Hodges. In addition, the jury acquitted Romero of the Steenblock robbery and kidnapping charges, showing it carefully evaluated the evidence.

27

### 4.  Joinder and severance

Romero contends that joinder of the Magnolia Center Interiors (Magnolia Center) burglary (predicated on entry with intent to steal and vandalize) and vandalism charges and the receiving stolen property (Feltenberger's ammunition pouch) charge with the remaining counts was "statutorily unauthorized" under section 954.  Defendants further contend the trial court abused its discretion in denying the motion to sever the Magnolia Center charges from the remaining charges, and Romero asserts the trial court abused its discretion in failing to sever the charge of receiving stolen property from the remaining charges against him.  We disagree.

Before trial, Self, joined by Romero, moved to sever *the murder counts* from the remaining charges.  Defendants focused particularly on severing the murder counts from the counts involving the attempted murders of Feltenberger and Williams.  The motion to sever did not contest that the statutory requirements for joinder had been met.  The trial court denied the motion.

Because it generally promotes efficiency, joinder of charges is " 'preferred by the law.' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 493 (*Hartsch*).)  When the statutory joinder requirements are met, a defendant can demonstrate error in a " 'ruling allowing joint trial . . . only by making a "*clear showing of prejudice . . . .*" ' " (*Ibid.*)  As can be seen, defendants did not claim joinder of any of the counts was statutorily unauthorized.  Under section 954, this claim is therefore forfeited.

Even had the claims of improper joinder not been forfeited, they would have lacked merit.  The charges were properly joined because they were "connected . . . in their commission" within the meaning of section 954.  Charges are so connected if " ' "there is a common element of substantial importance in their commission." ' " (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218, italics omitted.)  Here, the crimes all occurred within a two-month time period and, as the trial court observed, each involved a felonious intent to obtain property.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1054–

28

1058, 1074–1075 [petty theft charge was properly joined with unrelated murder, robbery, and vehicle-taking charges because the petty theft, robbery, and vehicle-taking charges involved "the common characteristic of the wrongful taking of another's property"]; *People v. Mendoza* (2000) 24 Cal.4th 130, 160 [crimes were connected in their commission when committed in close timeframe of three days and many of the crimes involved the felonious intent to obtain property].)  Contrary to Romero's contention that the "tenor" of the Magnolia Center burglary was vandalism, not theft, defendants were charged with burglary premised in part on entry with an intent to steal.  Moreover, the evidence demonstrated defendants made a concerted but unsuccessful effort to break into the Magnolia Center store safe and stole other items from the store.  Neither the circumstance that defendants also committed vandalism nor the minimal worth of the objects taken obviated their intent to steal.

Nor did defendants move to sever the Magnolia Center burglary and vandalism charges from the remaining counts, or Romero move to sever the charge of receiving stolen property from the remaining charges against him.  The trial court has "no statutory duty to order severance on its own motion." (*People v. Rogers* (2006) 39 Cal.4th 826, 851.)  Defendants' claims that the trial court abused its discretion in denying severance are therefore also forfeited.  (*People v. Ramirez* (2006) 39 Cal.4th 398, 439 ["defendant is limited on appeal to arguing that the trial court erred in failing to sever the charges" in the manner "requested at trial"]; see *People v. Tafoya* (2007) 42 Cal.4th 147, 163 ["defendant has forfeited this issue on appeal because he failed to assert this ground at the time his severance motion was heard by the trial court"].)

Even assuming the claim is preserved, no abuse of discretion is demonstrated.  "The party seeking severance has the burden to establish a substantial danger of prejudice requiring the charges to be separately tried.  [Citation.]  Refusal to sever may be an abuse of discretion where (1) evidence of the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the

jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citation.] If evidence on each of the joined crimes would have been admissible in a separate trial of the other crimes, then such cross-admissibility ordinarily dispels any inference of prejudice." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 281–282.)

Here, Self's counsel conceded at the hearing on the motion to sever the murder counts from the remaining counts that the evidence in "these cases" was "cross-admissible," and Romero's counsel "[j]oin[ed]" those remarks. On appeal, however, defendants claim the evidence was not cross-admissible. "We need not affirmatively decide, however, whether the evidence would have been cross-admissible in separate trials because, as defendant[s] acknowledge[], lack of cross-admissibility is not dispositive of whether the court abused its discretion in denying severance." (*People v. Myles* (2012) 53 Cal.4th 1181, 1201, citing § 954.1.) Considering the remaining three factors, we conclude no prejudice is demonstrated. Evidence of the murders, the burglary and vandalism of Magnolia Center, and Romero's receipt of stolen property was strong. Nor was evidence of the Magnolia Center crimes or Romero's receipt of stolen property more inflammatory than evidence defendants had callously murdered three young men, and attempted to murder three other individuals. Moreover, "[e]ven where the People present capital charges, joinder is proper so long as evidence of each charge is so strong that consolidation is unlikely to affect the verdict." (*People v. Ochoa* (2001) 26 Cal.4th 398, 423.)

Self further contends joinder of the Magnolia Center crimes, in hindsight, produced gross unfairness amounting to deprivation of a fair trial or a denial of due process at the guilt phase because evidence of the details of the vandalism "rais[ed] the possibility the jury [would] be swayed by the evidence of defendant's bad character." The evidence

Self murdered three individuals was strong and indeed is not challenged on appeal. There is therefore no reasonable probability Self would not have been found guilty of these murders had the jury not heard the evidence regarding the Magnolia Center crimes.

Likewise, and contrary to defendants' contention, joinder of the Magnolia Center crimes, in hindsight, did not produce gross unfairness amounting to deprivation of a fair trial or a denial of due process at the penalty phase. Given the brutal circumstances underlying their three murder and three attempted murder convictions, and Self's additional conviction for the attempted murder of Feltenberger, there is no reasonable possibility that a different verdict would have resulted had the jury not heard evidence of threatening graffiti and the stabbing of a sonogram photograph during the Magnolia Center burglary and vandalism. To the extent Romero asserts a similar claim regarding joinder of the receipt of stolen property charge, we have already concluded that even assuming evidence of the details of the attack on Feltenberger were improperly admitted, there is no reasonable possibility a different penalty verdict would have resulted absent admission of this evidence. (See *ante*, at pp. 26–27.)

## B. Guilt Phase Issues

### 1. Accomplice corroboration

The trial court instructed the jury that Jose Munoz was an accomplice as a matter of law as to certain crimes, including the crimes against Kenneth Mills and Vicky Ewy (counts V-VIII), and Knoefler (count XV), and "his testimony [was] subject to the rule requiring corroboration."**9** (§ 1111; see *ante*, at pp. 3, 5.) Self contends Munoz's

---

**9**  The court instructed Self's jury:

"A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense. . . . To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime which, if believed, *by itself and without any aid, interpretation, or direction from the testimony of the accomplice,* tends to connect the defendant with the commission of the crime

31

testimony was not corroborated and therefore his convictions for the crimes against Kenneth Mills, Ewy, and Knoefler must be reversed. He further contends the evidence was insufficient to establish his guilt as an aider and abettor of the crimes against Knoefler. We conclude Munoz's testimony was corroborated as to the crimes against Kenneth Mills and Ewy, but not as to the robbery of Knoefler. We therefore reverse Self's conviction and sentence for Knoefler's robbery.

Section 1111 provides in part: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." The requirement that accomplice testimony be corroborated is an " 'exception[]' to the substantial evidence" rule. (*People v. Najera* (2008) 43 Cal.4th 1132, 1137.) It is based on the Legislature's determination that " 'because of the reliability questions posed by' " accomplice testimony, such testimony " 'by itself is insufficient as a matter of law to support a conviction.' " (*Ibid.*; see *People v. Cuevas* (1995) 12 Cal.4th 252, 261.) Section 1111 does not affect the admissibility of accomplice testimony but rather

charged. However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crime charged or that it corroborate every fact to which the accomplice testifies. In determining whether an accomplice has been corroborated, *you must first assume the testimony of the accomplice has been removed from the case.* You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime. If there is not such independent evidence that tends to connect the defendant with the commission of the crime, the testimony of the accomplice is not corroborated. If there is such independent evidence which you believe, then the testimony of the accomplice is corroborated. If the crimes charged in the Information except Counts XI–XIV, XVI, XVII, and XX–XXIII [were] committed by anyone, the witness Jose Munoz was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration. The testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case." (Italics added.)

"reflects a legislative determination of how accomplice testimony must be treated."
(*Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 434; see *id.* at pp. 453–454; *People v. Bowley* (1963) 59 Cal.2d 855, 858.)

Thus, for the jury to rely on an accomplice's testimony about the circumstances of an offense, it must find evidence that " 'without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 505 (*Abilez*); see *People v. Davis* (2005) 36 Cal.4th 510, 543.) "The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." (*People v. Rissman* (1957) 154 Cal.App.2d 265, 278; see *People v. Trujillo* (1948) 32 Cal.2d 105, 111 (*Trujillo*) ["The prosecution is not required to single out an isolated fact which in itself, unrelated to other proven facts, is considered to be sufficient corroboration"].) The evidence "need not independently establish the identity of the victim's assailant" (*Abilez*, at p. 506), nor corroborate every fact to which the accomplice testifies (*Davis*, at p. 543), and " 'may be circumstantial or slight and entitled to little consideration when standing alone' " (*Abilez*, at p. 505). "The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 986.)[10]

---

[10] Although similarities between the circumstances of the crime—as evidenced either by the physical evidence or a witness's testimony—and an accomplice's testimony cannot be relied on under section 1111 to corroborate the accomplice's testimony, these similarities nevertheless do play a role. Even after deciding an accomplice's testimony is corroborated, the jury is instructed to view it with caution. Similarities between the accomplice's account and the physical evidence or a victim's description of the crime logically are considered in assessing that credibility.

### a. *Crimes against Kenneth Mills and Ewy*

Kenneth Mills testified that on October 22, 1992, between 11:30 p.m. and midnight, he and his girlfriend Vicky Ewy took a drive to look at the lightning. Mills was driving. As they drove down Moreno Beach Drive, a dark grey or blue hatchback coming in the opposite direction made a U-turn and began to drive in front of them. At the next stop sign the cars were next to each other, and the other car turned on its high beams and followed the victims. As Mills started to turn right, he saw for "no more than a second" the silhouette of a car next to him, and a "person from the waist up out of the" front "passenger window pointing a gun at me." The gun fired, hitting Mills in the face, and Mills sped away. He could not see out of his right eye and the vision in his left eye was blurry. The assailants continued to chase them until Mills turned onto a golf cart path near three model homes, one of which had all its lights on. Mills permanently lost vision in his right eye. A bullet hole was found in the top of the driver's window of Ewy's car and another hole near the bottom of the passenger window. Twenty-gauge plastic shotgun wadding was found on the passenger side floor. Shotgun pellets, too damaged for their size to be determined, were found in the passenger door.

Munoz testified that on or about the night of October 22, 1992, he was riding with defendants in Romero's girlfriend Sonia Alvarez's Dodge Colt in an isolated area past Moreno Valley and near Lake Perris. Romero was driving, Munoz was in the passenger seat, and Self was in the backseat. They had Self's sawed-off shotgun and a "single shot" rifle and were "going out stealing." They saw Ewy's red car, which Munoz identified at trial, and turned around. They pulled up alongside the car at a stop sign, and Munoz "was ready to get out . . . [and] carjack them." But Romero said, "Shoot 'em," and Self climbed out of the backseat window on the driver's side and fired the shotgun across the top of the Colt at the victims. The bullet hit the victims' driver's window, and the victims drove away.

34

Munoz's testimony was corroborated in part by the circumstance that 20-gauge shotgun wadding was found in Ewy's car on the passenger side floor. Self admitted in his statement to police that he had possessed a 20-gauge shotgun for about a month before he shot Feltenberger on November 30, 1992, and victim Jerry Mills, Sr. identified Self as the person holding a shotgun in that robbery. "Possession of a gun similar to that used in the commission of the crime has been deemed competent corroborative evidence . . . ." (*People v. Henderson* (1949) 34 Cal.2d 340, 343; *id* at pp. 344, 346 [accomplice testimony corroborated in part by the circumstance the defendant purchased a .410 shotgun the day before the attempted robbery in which such a shotgun was used]; see *Trujillo, supra*, 32 Cal.2d at pp. 111-112 [accomplice testimony corroborated in part by evidence the bullet that killed the victim could have come from the gun the defendant admitted was in his possession before the crime and which was found in his room after his arrest].)

In his statement to police Self also admitted purchasing 20-gauge shells for the shotgun about two weeks before the attack on Feltenberger, and appeared to say that before this purchase he "had shells to the gauge, this other guy, but those . . . weren't the same ones, we got those mixed up." Thus, although it is unclear, the jury could infer Self not only had 20-gauge shells before he purchased the one used on Feltenberger, but that he had used 20-gauge shells on another "guy."

Munoz's testimony was further corroborated by the circumstance that about a month later, on November 30, 1992, he and Self attacked and robbed Feltenberger in a manner similar to that of the attack on Kenneth Mills and Ewy. (*People v. Washington* (1969) 71 Cal.2d 1061, 1093 [accomplice's testimony corroborated by the testimony of numerous witnesses who identified the defendant as a participant in similarly perpetrated robberies on the same night and in the same vicinity as the robbery to which the accomplice testified, and a witness's identification of the car being driven away from the scene of the robbery "matched the description of the car given by other victims as the one

in which defendant was riding"]; *People v. Barillas* (1996) 49 Cal.App.4th 1012, 1021 [proof the defendant "committed three robberies or attempted robberies earlier that same evening using the same white pickup and having the same coperpetrator" in part corroborated accomplice testimony]; *People v. Blackwell* (1967) 257 Cal.App.2d 313, 320–321 ["similarity in the commission of crimes in a given locality is itself a circumstance tending to corroborate the testimony of an accomplice"]; *People v. Comstock* (1956) 147 Cal.App.2d 287, 298 ["Proof that a defendant committed other recent and similar offenses tending to show a consistent plan or method of misconduct" may corroborate accomplice testimony].) Here, in both the attack on Kenneth Mills and Ewy and the attack on Feltenberger, the victims were driving in isolated areas late at night when a car suddenly appeared and drove beside them before the shotgun attack. Although Feltenberger pulled over before he was shot, he only did so because he mistook the perpetrators' car for that of his newspaper carrier; indeed, Self said in his statement to police, Munoz "saw [Feltenberger] and tried to cut him off." Feltenberger identified Self as the person who shot him with a shotgun, and Self admitted to police he was with Munoz that night and wounded Feltenberger with his 20-gauge shotgun.

In sum, Munoz's testimony was corroborated as to the crimes against Kenneth Mills and Vicky Ewy.

### b. *Robbery of Knoefler*

Self contends no evidence corroborated Munoz's testimony that Self was "even in the car or otherwise present at the scene" of Knoefler's robbery. We agree.

Knoefler testified that on November 20, 1992, about 3:30 p.m., he was tending beehives at Markham Street and Washington Street in Riverside County. Parked nearby was his 1987 pickup truck. A man approached Knoefler, struck up a conversation about the bees, and walked around the bee yard. Knoefler testified he "seemed to be [a] pretty nice guy." The man then brandished what appeared to be a sawed-off shotgun and

36

demanded the keys to Knoefler's truck. Knoefler gave him the keys. Another man wearing a ski mask appeared. The first man said he needed some money for gas, and Knoefler handed him about $50. The men left in the truck.

Munoz testified that during the daytime on or about November 20, 1992, he was riding in Alvarez's Colt with defendants and Chavez. They were "going to go steal," and were carrying Self's 20-gauge shotgun and perhaps another weapon. They noticed the beekeeper, and decided to send Romero, carrying Self's shotgun, to see what valuables the man had. After a few minutes, Munoz, wearing a mask, went to see what "was taking him so long" and hid when he heard Romero and the beekeeper talking. Romero told the "old man" he needed his truck, and the man said, "I was wondering why you were being so nice to me." Munoz appeared and Romero told the man "I'm going to need gas money," and the man offered Romero $25. Romero said he wanted all of it, and the man gave him about $75. Munoz and Romero then left in Knoefler's truck and drove back to the Colt. Self and Chavez, in the Colt, followed Romero and Munoz to an open field. Romero and Munoz pushed the truck down an embankment, then got into the Colt and left the area.

Although a shotgun was used in the robbery, and Self admitted in his statement to police that he had possessed a shotgun for about a month before he shot Feltenberger on November 30, 1992, there is no dispute *Romero*, not Self, was holding the shotgun when Knoefler was robbed. Thus, this circumstance does not corroborate Munoz's testimony that Self was present at the robbery. (See *People v. Robinson* (1964) 61 Cal.2d 373, 379, 398 [the defendant's fingerprints on a car associated with the murder did not connect the defendant to the murder given both the defendant and the car's recent owner were frequent visitors to the defendant's cousin's apartment and there was no evidence as to when the fingerprints were left on the car].)

In her brief the Attorney General asserts Munoz's testimony is "largely corroborated by Knoefler's testimony; specifically, that Romero, armed with a shotgun, and Munoz, arriving a bit later, robbed him of his cash and fled in his truck." We disagree.

As noted above, section 1111 provides that an accomplice's testimony is not corroborated by evidence that "merely shows the commission of the offense or the circumstances thereof." In other words, an accomplice's testimony is not corroborated by the circumstance that the testimony is consistent with the victim's description of the crime or physical evidence from the crime scene. Such consistency and knowledge of the details of the crime simply proves the accomplice was at the crime scene, something the accomplice by definition *admits*. Rather, under section 1111, the corroboration must connect the defendant to the crime *independent* of the accomplice's testimony.

As originally enacted in 1872, section 1111 provided: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof." (Ann. Pen. Code (1872) p. 390.) A note following section 1111 in the annotated Penal Code cites and quotes from *People v. Ames* (1870) 39 Cal. 403. In *Ames*, the robbers were disguised and used numbers during the robbery to refer to one another. (*Id*. at pp. 403–404) At one point a robber was referred to as "Charley" and the speaker immediately substituted the term "Number Three." (*Ibid*.) One of the robbers testified at trial that the defendant Charles Ames was known as "Charley," and during the robbery was designated "Number Three." (*Id*. at p. 404.) This court reversed the judgment against the defendant, stating: "[T]he corroborating evidence must, of itself, and without the aid of the testimony of the accomplice, tend, in some degree, to connect the defendant with the commission of the offense. It need not, of course, be sufficient to establish his guilt; for, in that event, the testimony of the accomplice would not be needed. But it must tend, in some slight

38

degree at least, to implicate the defendant. . . . [A]side from the testimony of the accomplice, and laying that entirely out of view, there was no evidence whatever in this case 'tending to connect the defendant with the commission of the offense.' The fact that one of the robbers was addressed as 'Charley,' and again as 'Number Three,' and that they designated each other by numbers, no more tends, of itself, to connect the defendant with the crime than it would . . . any one else." (*Id*. at pp. 404–405.)

In 1911, the statute was revised, as relevant here, to its present form (except for the substitution in 1915 of "it" for "he" in the first clause). (Stats. 1911, ch. 292, § 1, p. 484.) This court subsequently held that the 1911 amendment did not change the meaning of the statute. (*People v. Robbins* (1915) 171 Cal. 466, 473–474.) Our cases continue to refer to the requirement that the corroborating evidence " 'must, without aid from the accomplice's testimony, tend to connect the defendant with the crime' " (*Abilez, supra*, 41 Cal.4th at p. 505), and Self's jury here was so instructed.[11] (See *ante*, p. 31, fn. 9.)

We conclude Munoz's testimony that Self robbed Knoefler was not corroborated. Reversing this conviction does not affect the penalty judgment because, given the nature of Self's additional crimes, there is no reasonable possibility the penalty judgment would have been different had he not been convicted of Knoefler's robbery. Given that we reverse Self's conviction for the Knoefler robbery, we need not address Self's further claim that no substantial evidence supports his conviction for this offense under a theory of aiding and abetting.

---

[11] In *People v. Miranda* (1987) 44 Cal.3d 57, 100, this court stated a witness's description of the events that led to a stabbing closely matched the accomplice's version of events, and this "evidence was enough to connect defendant with the killing and therefore to support the credibility" of the accomplice. In *Miranda*, however, in addition to the similarity in detail between the witness's and the accomplice's accounts, the witness observed the defendant hold a knife to the victim's throat and then follow the victim down the street. (*Id*. at p. 93.) Such evidence independently linked the defendant to the stabbing.

## 2. Evidence of Romero's attempted escape

Defendant Romero contends that the trial court erred in admitting escape evidence because it amounted to no more than planning and did not constitute an attempt. We disagree.

Before trial the prosecutor moved to admit escape evidence at the guilt phase. Romero unsuccessfully opposed the motion on the ground that it was unduly prejudicial under Evidence Code section 352.[12]

" 'Evidence of a planned escape permits an inference of consciousness of guilt, even if the escape was not actually attempted.' " (*People v. Box* (2000) 23 Cal.4th 1153, 1205.) Moreover, here there was substantial evidence of an attempted escape. Although the terms "escape" and "attempted escape" are "not statutorily defined, case law has defined 'escape' as the unauthorized or ' "unlawful departure of a prisoner from the limits of his custody." ' [Citations.] 'The crime is completed when the prisoner wilfully leaves the prison camp, without authorization . . . .' " (*People v. Bailey* (2012) 54 Cal.4th 740, 748–749 (*Bailey*).) Attempted escape requires "a specific intent to escape" and " 'a direct, unequivocal act to effect that purpose.' " (*Id*. at p. 749.)

Here, Romero's intent to escape was demonstrated by his statement to fellow inmate Dicken that he was planning to escape by taking the nighttime deputy hostage, threatening him with a shank, and leaving the jail. Romero also committed acts to effectuate this intent when he obtained hacksaw blades, completely severed the bars to his cell, creating a hole large enough to escape, and armed himself. (See *People v. Mason* (1991) 52 Cal.3d 909, 954–955 (*Mason*) [noting the defendant attempted to escape once by sawing loose on two sides the metal screen that covered his cell window

---

12      Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

and again by making a three- by three-inch cut in the replacement screen]; compare *People v. Lancaster* (2007) 41 Cal.4th 50, 91, 94 (*Lancaster*) [mere possession of a handcuff key "was not sufficient to establish an escape attempt"].) As the Attorney General observes, Romero "did everything but actually escape from his cell."

Romero contends that this evidence shows he only prepared to escape but did not attempt to escape because "he had not started going anywhere." We have previously rejected this view. " 'The introduction into the concept of attempt to escape of a requirement of intentionally doing an act, the direct, natural and probable consequence of which, if successfully completed, would be an escape, too narrowly limits the application of the statute. Such an act could be to pass part way through a door, window or other opening to the outside of the place of confinement before falling back, being pulled back or disabled. [¶] . . . [¶] The Legislature has not proscribed the doing of any single defined act as an attempt to escape. Many acts, including some non-criminal in themselves, might be conducive toward carrying out an intention to escape, and the scope of the statute proscribing such an attempt should not be limited to specifically designated acts.' [Citation.] Thus, the heightened mental state required for an attempt to escape serves to 'separate[] criminality itself from otherwise innocuous behavior.' (*United States v. Bailey* [(1980)] 444 U.S. [394,] 405.)" (*Bailey, supra*, 54 Cal.4th at pp. 750–751.)

### 3. Asserted prosecutorial misconduct

Self contends the prosecutor repeatedly vouched for the credibility of Jose Munoz during his opening statement and closing argument. Not so.

Self did not object to the prosecutor's statements or seek an admonition, and no exception to the general rule requiring an objection and request for admonition is applicable. The claim is therefore forfeited. (*Samayoa, supra*, 15 Cal.4th at p. 841.)

41

It is also meritless. "A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record." (*People v. Frye* (1998) 18 Cal.4th 894, 971 (*Frye*).) "However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [his] comments cannot be characterized as improper vouching." (*Ibid*.) Here, the prosecutor simply advanced the view Munoz was credible based on the evidence, which is permissible.

Self further asserts counsel was ineffective in failing to object to the prosecutor's statements. For example, Self contends effective counsel would have objected when the prosecutor improperly referred to Munoz's statement to police, thus implying that evidence the jury had not seen established Munoz's veracity. Contrary to Self's implication, the jury heard nearly all of Munoz's statement, and the remainder was described by the interviewing officer. There was no misconduct, hence there was no valid basis for objection.

### 4. Asserted instructional error

#### a. Accomplice instructions

Self contends the trial court erred in failing to instruct the jury sua sponte it could not aggregate evidence or incidents to corroborate the accomplice testimony of Munoz and to determine guilt. There was no error.

The trial court instructed the jury in the language of CALJIC No. 17.02: "Each count charges a distinct crime. You must decide each count separately. The defendant may be found guilty or not guilty of any or all of the crimes charged. Your finding as to each count must be stated in a separate verdict." Self contends the court, sua sponte, should have modified this instruction to tell the jury it "must decide each count separately

42

on the law and the evidence applicable to it, including the evidence required to corroborate the accomplice's testimony."

Self has forfeited this claim by failing to request a modification of CALJIC No. 17.02. (*People v. Geier* (2007) 41 Cal.4th 555, 579 [the defendant's failure "even to propose a modification of CALJIC No. 17.02, or to propose an additional instruction" forfeited the instructional error claim].)

The claim also lacks merit. The instructions given informed the jury of the offenses for which Munoz was an accomplice as a matter of law, and that his testimony as to certain charged offenses must be "corroborated by other evidence which tends to connect such defendant *with the commission of the offense*." (Italics added.) They further provided, "To corroborate the testimony of an accomplice there must be evidence of some act or fact *related to the crime* which, if believed, by itself and without any aid, interpretation, or direction from the testimony of the accomplice, tends to connect the defendant *with the commission of the crime charged*." (Italics added.) This language informed the jury that evidence corroborating Munoz's testimony was required for each count as to which Munoz was an accomplice as a matter of law. Contrary to Self's assertion, there is no reasonable likelihood the jury would have understood the instructions to mean it could "use[] Feltenberger's corroborating testimony as to counts XVIII and XIX to find the requisite corroboration on unrelated counts V through VII," or treat "Munoz's accomplice testimony as to counts I and II" as "corroborated by the victim's testimony in the unrelated . . . Meredith robbery (count IV) or by" Rankin's testimony regarding the shooting in counts IX and X.

Self further contends that in the absence of his proposed instruction the jury likely would "treat evidence of [Self's] involvement on some counts as evidence of his guilt on other, unrelated counts charged against him." To the extent Self claims the jury could not consider evidence on one count to prove his guilt on other counts we reject the claim. (See *People v. Lynch* (2010) 50 Cal.4th 693, 760–761 [trial court properly refused to give

43

proposed instruction that each count must be proven independently of the other counts because the evidence was cross-admissible and the jury was instructed in the language of CALJIC No. 17.02].)

### b. CALJIC No. 3.02

Romero contends instruction in the language of CALJIC No. 3.02 creates an unconstitutional mandatory presumption that aiding and abetting a robbery in which murder was a natural and probable consequence is equivalent to aiding and abetting murder, and thus "effectively require[s]" the jury to presume "intent to encourage or facilitate a murder."[13] We need not address this issue because the jury here was also instructed on felony murder based on robbery and found true robbery-murder special-circumstance allegations as to all three murders.[14] We can deduce from these special

---

[13] The court instructed the jury in the language of CALJIC No. 3.02: "One who aid[s] and abets another in the commission of a crime is not only guilty of that crime but is also guilty of any other crime committed by the principal which is a natural and probable consequence of the crime[] originally aided and abetted. In order to find the defendant guilty of the crime of murder . . . as an aider and abettor, you must be satisfied beyond a reasonable doubt: One, the crime of robbery or attempt[ed] robbery was committed; Two, the defendant aided and abetted such crime; Three, a co-principal in such crime committed the crime of murder, and, Four, the crime of murder was a natural and probable consequence of the commission of the crime of robbery or attempt[ed] robbery."

[14] The trial court instructed the jury: "The unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs during the commission or attempted commission of the crime as a direct causal result of robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime. The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt. If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons who either directly and actively commit the act constituting such crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder in the first degree whether the killing is intentional, unintentional, or accidental."

44

circumstance findings that the jury necessarily found Romero guilty of first degree felony-murder under section 189. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1019.) Under the felony-murder rule those who commit enumerated felonies are " 'strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony.' " (*People v. Gonzales* (2011) 51 Cal.4th 894, 943.) Thus, there was no need for the jury to find, as Romero contends, an "intent to encourage or facilitate a murder."

The felony-murder rule operates independently from an "aider and abettor's liability for murder under the natural and probable consequences doctrine." (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) To the extent the jury understood it also needed to find "the crime of murder was a natural and probable consequence of the commission of the crime of robbery or attempt[ed] robbery" because it was instructed in the language of CALJIC No. 3.02, Romero could have only benefitted from this ambiguity.

### c. *Reasonable doubt instruction*

Defendants contend instruction in the language of CALJIC No. 2.90 does not adequately define reasonable doubt. Self additionally contends such instruction in conjunction with other jury instructions impermissibly undermined and diluted the prosecutor's burden of proof of guilt beyond a reasonable doubt.[15] We disagree.

---

[15] Both juries received the standard instruction on reasonable doubt. The court instructed Romero's jury: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People . . . the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." A virtually identical instruction was given to Self's jury.

45

The court's instruction properly defined the prosecution's burden of proof. (*People v. Brown* (2004) 33 Cal.4th 382, 391–392 [upholding instruction substantially similar to that given here] (*Brown*); see *Victor v. Nebraska* (1994) 511 U.S. 1, 14–15 ["An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof"].) Thus, contrary to Self's assertion, there is no reasonable likelihood the jurors understood the instruction to mean "they must articulate reason and logic for their doubt . . . before such doubt[] could be considered sufficient to acquit." (See *People v. Capistrano* (2014) 59 Cal.4th 830, 879 (*Capistrano*).) Nor, as he also asserts, does the instruction erroneously inform the jury that reasonable doubt is "not a mere possible doubt" (*Capistrano*, at p. 880) or err in the use of the term "until" instead of "unless" when it provides " '[a] defendant in a criminal action is presumed to be innocent until the contrary is proved' " (*People v. Lucas* (2014) 60 Cal.4th 153, 295–296 (*Lucas*); *People v. Thomas* (2012) 53 Cal.4th 771, 812). Contrary to his assertion, CALJIC No. 2.90 is not wanting because it does not expressly state "that the accused need not present any evidence for the jury to have a reasonable doubt," given there is no reasonable likelihood the jury understood the instruction to mean Self had the burden of producing sufficient evidence to raise a reasonable doubt of his guilt. (*Frye, supra*, 18 Cal.4th at p. 974.) Further, and contrary to Romero's assertion, changes in the instruction after the crime and before trial deleting reference to moral evidence and moral certainty do not implicate due process and ex post facto concerns. (*Brown*, at pp. 390–392.)

"[W]e have previously considered and rejected the argument" that instruction in the language of CALJIC No. 2.90 in conjunction with other instructions "improperly dilute[s] the constitutional requirement that guilt be proven beyond a reasonable doubt." (*People v. Vines* (2011) 51 Cal.4th 830, 885 (*Vines*) [rejecting challenge to CALJIC Nos. 2.01, 2.21.2, 2.27]; see *People v. Sattiewhite* (2014) 59 Cal.4th 446, 479 [rejecting challenge to CALJIC No. 1.00]; *People v. Solomon* (2010) 49 Cal.4th 792, 826–828

46

[rejecting challenges to CALJIC Nos. 2.01, 2.11, 2.21.2]; *People v. Roberts* (1992) 2 Cal.4th 271, 314–315 [no possible prejudice in giving over the defendant's objection CALJIC Nos. 2.60 and 2.61 concerning a defendant's right not to testify].) Self "advances no persuasive reason to reconsider our prior rejection of challenges to these instructions, and we decline to do so." (*Vines*, at p. 885.)

> ### d. Error in allowing jury to make two special circumstance findings as to each murder count

Romero contends the trial court erred in instructing the jury to make two multiple-murder special-circumstance findings as to each count of murder. (§ 190.2, subd. (a)(3).) The Attorney General concedes the error. We agree, and vacate five duplicative multiple-murder special-circumstance findings for each defendant. (*People v. Hardy* (1992) 2 Cal.4th 86, 191, 216.) Contrary to Romero's assertion, he was not prejudiced by the duplicative findings. Rather, we apply the settled rule that "the jury's consideration of duplicative multiple-murder special circumstances is harmless where, as here, the jury knows the number of murders on which the special circumstances are based." (*People v. Marshall* (1996) 13 Cal.4th 799, 855.)

### 5. Validity of section 190.2, subdivision (d)

Romero contends that section 190.2, subdivision (d), enacted in 1990 by Proposition 115, is invalid because Proposition 114, also on the 1990 ballot, received more votes. We have previously rejected this argument and Romero cites no persuasive reason to revisit our conclusion. (*People v. Morgan* (2007) 42 Cal.4th 593, 621–622; *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 989–992.)

47

### C. Penalty Phase Issues

#### 1. Assertedly biased jurors

Self contends that Jurors Nos. 1, 2, 4, 6, 8, 9, 11, and 14[16] were "strongly in favor of the death penalty and should have been dismissed for cause" because they were actually biased against him on the penalty issue. The claim is forfeited because Self challenged only one of these jurors (Juror No. 8) for cause, and did not use an available peremptory challenge to remove that juror.[17] (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 25–26 [failure to use a peremptory challenge to remove a prospective juror forfeits a claim the trial court erred in denying a challenge for cause against the prospective juror]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 48 (*Coffman and Marlow*) [failure to challenge for cause purportedly biased jurors "forfeit[s] any appellate claim of error in the seating of those jurors"].) Nor did Self object to the jury as finally constituted. (*People v. Souza* (2012) 54 Cal.4th 90, 130; *People v. Virgil* (2011) 51 Cal.4th 1210, 1239.)

In an appropriate case, a forfeited claim of juror bias can be asserted on appeal under the rubric of ineffective assistance of counsel. Self further contends trial counsel was ineffective in failing to challenge for cause and then excuse by peremptory challenge Juror Nos. 1, 2, 4, 6, 9, 11, and 14. "[A] prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' " 'prevent or substantially impair' " ' the performance of the juror's duties as defined by the court's instructions and the juror's oath.' [Citation.] A prospective juror who would be unable conscientiously to consider all of the sentencing alternatives, including, when appropriate, the death penalty, is properly subject to excusal for cause. [Citation.] Our

---

[16] Juror No. 14, originally an alternate, served on the jury during both the guilt and penalty phases.

[17] We disapprove any language to the contrary in *People v. Whalen* (2013) 56 Cal.4th 1, 51.

review of the record confirms that none of the [eight] jurors who defendant asserts were biased would have been properly excused under this standard, as each expressed a willingness to consider all the evidence presented before reaching a decision as to penalty. Counsel therefore did not perform deficiently in not challenging those jurors for cause." (*Coffman and Marlow, supra*, 34 Cal.4th at p. 48.)

Nor on this record has Self demonstrated counsel was ineffective in not removing these jurors by peremptory challenge. (*People v. Montiel* (1993) 5 Cal.4th 877, 911 ["Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process"].)

### 2. Evidentiary issues

#### a. *Victim impact evidence*

Before the penalty phase began, Self, joined by Romero, unsuccessfully moved to exclude all victim impact evidence. Self here contends that the trial court erroneously admitted victim impact evidence, and that the prosecutor committed misconduct by offering and then arguing this evidence. Both defendants challenge the quantity and content of the evidence. We reject the claims.

"In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825–827.) Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 (*Pollock*).) We conclude neither the federal nor the state standard was violated here.

Defendants contend that the victim impact evidence was "excessive, improper, inflammatory, and highly prejudicial." Defendants did not object at any time during the

49

testimony, and this claim is therefore forfeited.  (*People v. Wilson* (2005) 36 Cal.4th 309, 357 (*Wilson*) [failure to object to victim impact testimony as exceeding the scope of § 190.3, factor (a) forfeits the claim].)  Self's motion in limine sought to broadly exclude all victim impact evidence on constitutional grounds, and did not specifically object to the admission of any particular witness's testimony anticipated in this case.  (See generally *People v. Morris* (1991) 53 Cal.3d 152, 189–190.)  Thus denial of the motion in limine did not make objection during testimony redundant, but rather it was incumbent on defendants to object if they believed the testimony actually presented was "excessive, improper, inflammatory, and highly prejudicial."  (See *id.* at p. 190.)

The claim is also meritless.  A total of six witnesses were presented from the families and friends of the three murder victims.  (See *ante*, at pp. 10-11.)  The testimony took place on a single day before both juries and spans 96 pages of the reporter's transcript.  Twelve photographs of Jose Aragon or aspects of his life, nine of Joey Mans, and seven of Timothy Jones, were admitted.  The evidence can scarcely be characterized as "excessive."

Moreover, the content of the testimony was neither inflammatory nor unduly prejudicial.  " '[U]nless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim and the community is relevant and admissible under section 190.3, factor (a) as a circumstance of the crime.  [Citation.]  The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair.' " (*Vines, supra*, 51 Cal.4th at p. 889.)  Here, the testimony fell well within these bounds and was similar to that we have previously upheld.  (See *People v. Murtishaw* (2011) 51 Cal.4th 574, 579, 581–582, 595; *People v. Verdugo* (2010) 50 Cal.4th 263, 296–298; *People v. Dykes* (2009) 46 Cal.4th 731, 779–783 (*Dykes*); *Wilson, supra*, 36 Cal.4th at p. 357.)  Contrary to Self's contention, that the witnesses described events that occurred before or after the murders was proper.  (*Brown, supra*, 33 Cal.4th at pp. 397–398.)  Their recollections "simply served to explain why

50

they continued to be affected by [the] loss and to show the 'victim[s'] "uniqueness as . . . individual human being[s]." ' " (*Id.* at p. 398, quoting *Payne v. Tennessee, supra*, 501 U.S. at p. 823.)

Self relies on comments made by the trial court during record correction six years after trial. While addressing requests to settle the record as to gestures by attorneys or witnesses during the five-month trial the court commented it did not think it was "possible or realistic for us to go that far back in time to remember what a witness was pointing at or what type of gesture they were making or what type of demeanor they were demonstrating." The court stated that although it had some independent recollection of events during trial they were "few and far between." It did recall certain events, including when the victim impact testimony was presented, saying it was a "very painful and agonizing [day] for everyone who was in the courtroom," "there wasn't a dry eye in the courtroom," and "[t]hat's the day that I will always have with me." These comments do not demonstrate that the victim impact evidence was unduly prejudicial or that "the court's impartiality was undermined" by the evidence. Indeed, trial courts must be aware of juror and spectator reactions as part of their diligent trial management, and we presume they are capable of setting this information aside when rendering their rulings. (See *People v. Chatman* (2006) 38 Cal.4th 344, 365.) Moreover, the callous and unprovoked nature of the murders understandably triggered an emotional reaction in the persons who testified and those observing in the courtroom, but this did not render the testimony inflammatory or unduly prejudicial. (*People v. Jurado* (2006) 38 Cal.4th 72, 132, 134 ["The record does not support defendant's suggestion that after hearing the victim impact testimony the jurors were so overwhelmed by emotion that they were unable to make a rational determination of penalty," where "at least two of the jurors had been in tears" at the break and "defendant had been 'crying and sobbing' as well"]; *Wilson, supra*, 36 Cal.4th at p. 357 [approving admission of evidence of victim's " 'understandable human reactions' "]; see generally *People v. Zamudio* (2008) 43

51

Cal.4th 327, 368 (*Zamudio*) ["Although jurors must never be influenced by passion or prejudice," "the requested instruction is misleading to the extent it indicates that emotions may play no part in a juror's decision to opt for the death penalty"].)

Self also contends that " 'expansive' " victim impact evidence " 'will inevitably make way for racial discrimination to operate in the capital sentencing jury's life or death decision.' "  Relying on *Turner v. Murray* (1986) 476 U.S. 28, he further asserts racial prejudice will remain undetected, and that this "danger is particularly acute where the jury, as here, is virtually all Caucasian—as were two of the victims—and [Self] is Hispanic."  In *Turner v. Murray*, which involved "a black man sentenced to death for the murder of a white storekeeper," the high court held the trial court erred in failing to allow questioning of prospective jurors on the issue of racial prejudice.  (*Turner*, at pp. 29, 33, 36–37.)  Self fails to demonstrate how *Turner* bears on the issue of admission of victim impact evidence, or otherwise supports his assertion that the victim impact evidence here "invited both arbitrary or invidious comparisons and, especially in cross-racial cases like this one, arbitrary comparisons tainted by racial bias against Hispanics."

Self further contends that victim impact evidence should be limited to (1) "testimony from a single witness," (2) testimony that "describes the effect of the murder on a family member who was present at the scene during or immediately after the crime," and (3) "consequences that were known or reasonably apparent to the defendant at the time he committed the crime or were properly introduced to prove the charges at the guilt phase of the trial."  We have previously rejected all of these contentions, and Self cites no persuasive reason to revisit our conclusion.  (See, e.g., *People v. Trinh* (2014) 59 Cal.4th 216, 245–246; *Pollock, supra*, 32 Cal.4th at p. 1183.)

Self further contends that the prosecutor committed misconduct by offering this evidence and then relying on it during closing argument.  We have concluded this evidence was properly admitted.  Hence the prosecutor did not commit misconduct by relying on it during closing argument.

52

### b. Evidence of assault on Tyreid Hodges, attempted escape, and shank possession

Defendant Romero contends that the trial court erroneously admitted evidence of his assault on Tyreid Hodges, attempted escape, and shank possession. (See *ante*, at pp. 8-9, 12-13.) The evidence was properly admitted.

#### (1) Hodges

Romero contends that "[n]othing done to Hodges was a violent crime" within the meaning of section 190.3, factor (b). Romero told Hodges that "if he had his way about it . . . he would . . . take [Hodges] out." Romero squirted urine from a bottle on Hodges, stepped on a carton of feces, splattering the contents on Hodges, and "squished" a shampoo bottle containing urine, causing it to hit Hodges. He also threw a hairbrush at but missed Hodges. These actions were assaults and batteries and hence admissible under section 190.3, factor (b). (*People v. Banks* (2014) 59 Cal.4th 1113, 1197–1198 [deputy's testimony about the "defendant's assault upon him with a container filled with urine and feces was admissible"]; *People v. Burgener* (2003) 29 Cal.4th 833, 868 [each instance when the defendant "threw water, urine, scouring powder, bleach, and other substances at correctional officers . . . constitute[d] a battery" and was admissible under § 190.3, factor (b)]; *People v. Pinholster* (1992) 1 Cal.4th 865, 960-961 ["throwing a cup of urine in a person's face is a battery, since '[a]ny harmful or offensive touching constitutes an unlawful use of force or violence' and thus a battery under section 243" and is admissible under § 190.3].)

#### (2) Attempted escape

Romero asserts that the jury was erroneously permitted to use evidence of his attempted escape in aggravation at the penalty phase because it was merely a planned and not an attempted escape. (See *Lancaster, supra*, 41 Cal.4th at p. 94 [mere preparation for escape is insufficient under § 190.3].) Because we have previously concluded the

evidence here demonstrated an attempted escape (see *ante*, pp. 40–41), this contention fails.

Romero further contends that the escape evidence did not demonstrate an express or implied threat of force or violence under section 190.3, factor (b). He did not object on this basis below, and the claim is therefore forfeited. It is also meritless. Although evidence of attempted escape alone is not admissible under section 190.3, factor (b), here the evidence indicated Romero not only planned to escape by taking the nighttime deputy hostage and threatening him with a shank, he was also observed with a shank, and a weapon was found in his cell. That is sufficient. (*Mason, supra*, 52 Cal.3d at pp. 954–956 [escape evidence admissible under § 190.3, factor (b) when "an escape from the administrative segregation cell would almost certainly have involved defendant in a confrontation with a guard"].)

Romero further contends trial counsel was ineffective in failing to object to evidence of the escape attempt at the guilt phase on the ground the evidence "had no legitimate use" at the penalty phase. The evidence was admissible; therefore, he establishes no deficiency on counsel's part in failing to object on this basis.

Romero also contends that instruction in the language of CALJIC Nos. 6.00, 6.01, and 6.02 "fail[ed] to ensure that the jury understood that the purported escape attempt could not be weighed as a circumstance in aggravation if it was only preparation."**18** Not

---

**18**      The court instructed the jury: "An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime and a direct but ineffectual act done towards its commission. In determining whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation which may . . . consist of planning the offense or of devising or obtaining or arranging the means for its commission, is not sufficient to constitute an attempt. However, acts of a person who intends to commit a crime will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to commit that specific crime. Such acts must be an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original

so. The court instructed the jury mere preparation was "not sufficient to constitute an attempt," and further required the jury—in order to find Romero had committed attempted escape by force or violence—to find Romero's "acts clearly indicate[d] a certain, unambiguous intent to" escape and were "an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design." It is not clear whether instruction in the language of CALJIC No. 6.00 is consistent with our recent discussion of attempted escape in *Bailey, supra*, 54 Cal.4th 740, but to the extent the court's instructions were too stringent, Romero could have only benefitted from the error. (See *id.* at p. 749 [stating attempted escape requires "a specific intent to escape" and " 'a direct, unequivocal act to effect that purpose' "]; and see *id.* at p. 750 [noting " '[t]he introduction into the concept of attempt to escape of a requirement of intentionally doing an act, the direct, natural and probable consequence of which, if successfully completed, would be an escape, too narrowly limits the application of the [escape] statute' "].)

### (3) Shank

Romero contends the trial court erred in admitting evidence he possessed shanks in jail. Romero did not challenge the admission of this evidence below, and the claim is therefore forfeited. It is also meritless. " 'It is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible under [section 190.3,] factor (b). Such conduct is unlawful and involves an implied threat of violence

---

design. A person who has once committed acts which constitute an attempt to commit a crime is liable for the crime of attempted escape by force or violence even though he does not proceed further with the intent to commit the crime, either by reason of voluntarily abandoning his purpose or because he was prevented or interfered with in completing the crime. If a person intends to commit a crime but, before committing an act toward the ultimate commission of the crime, freely and voluntarily abandons the original intent and makes no effort to accomplish it, such person has not attempted to commit the crime."

even where there is no evidence defendant used or displayed it in a provocative or threatening manner.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 1002.)

### c. Exclusion of mitigating evidence

Romero contends the trial court erroneously excluded his mother Maria Self's testimony that as a child she had been raped repeatedly by two of her brothers.

During Maria's direct testimony, she said her relationship with two of her brothers was "not good" because she "was afraid of them." When counsel asked why she was afraid, the prosecutor's relevance objection was sustained. At sidebar, counsel said he was eliciting testimony Maria had been raped by her brothers for seven years starting when she was six years old. The court stated Maria's engaging in abusive behavior toward her sons was relevant, but the reason why she was abusive was not relevant. After hearing further argument, the court ruled such testimony was not relevant "at this point in time" because it did not "relate to factors in mitigation for the defendants." Even if the evidence were relevant, the court found it "highly prejudicial" because it would confuse and mislead the jury, and therefore also excluded it under Evidence Code section 352. The court further stated that if on cross-examination it appeared the prosecutor raised "any issues that might open the door to her giving this testimony on redirect," it would reconsider its ruling. Counsel did not raise the issue after Maria's cross-examination.

" 'The Eighth and Fourteenth Amendments require that the sentencer in a capital case not be precluded from considering any relevant mitigating evidence, that is, evidence regarding "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ' [Citation.] 'Nonetheless, the trial court still " 'determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of

56

confusing the issues or misleading the jury.' " ' (*People v. Williams* (2006) 40 Cal.4th 287, 320; see *Romano v. Oklahoma* (1994) 512 U.S. 1, 12 ['The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings.']; *Lockett v. Ohio* (1978) 438 U.S. 586, 604, fn. 12 ['Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.'].)" (*People v. Farley* (2009) 46 Cal.4th 1053, 1128.)

Here, evidence defendant Romero's mother had been raped as a child had no bearing on his character, record, or the circumstances of the offense. The court therefore did not abuse its discretion in excluding this evidence.

### 3. Asserted prosecutorial misconduct

Romero contends the prosecutor committed misconduct when he misled the court about his intended use of Romero's statement to his girlfriend Stephanie Stinson, and then used the statement to argue Romero's future dangerousness. There was no misconduct.

As noted above, on June 12, 1994, Romero lured fellow Riverside jail inmate Olen Thibedeau to his cell and then stabbed him in the stomach with a spear more than four feet long. (See *ante*, p. 12.) Thibedeau was facing charges of child molestation and was later convicted of these crimes. On February 8, 1995, Romero visited with Stephanie Stinson and their conversation was recorded. Romero said: "I don't like violence. I try to avoid it. But when they stick a child molester next door to me [and] expect me not to do something, I'll be his friend, talk to him real nice, bring him close to the door, and then make him a little spear about this long, about this skinny, that's real hard and won't bend. You put a pencil at the end of it and strips of wood. [¶] . . . [¶] Stick him in his neck."

At the hearing on whether to admit Romero's statement to Stinson, the prosecutor observed that on cross-examination the defense had "made quite an effort to impugn . . . Thibedeau's credibility." The prosecutor contended that Romero's later statement to Stinson was an admission that "he did[] exactly what . . . Thibedeau said." The trial court admitted the statement to rehabilitate Thibedeau.

During closing argument, the prosecutor said Romero "has shown in jail since his arrest that he is not done hurting people, that he still wants to kill and rob and terrorize and hurt." He described Romero's attempted escape in which he planned to threaten a guard with a shank, his possession of shanks in jail, the robbery and beatings of Medeiros and Jutras, and the battery of Hodges with urine and feces. The prosecutor then said, "And he tried to run a spear through . . . Thibedeau." After describing the incident, the prosecutor said: "He is proud of it. Romero is proud of it. You heard him fondly remembering this event on tape." He played the tape of Romero's statement to Stinson, and said: "He is so proud. Mr. Romero gives you your verdict right there. You can't expect him not to do something like this. He said it, 'But when they stick a child molester next door to me and not expect me to do something . . . .' He is telling you what to expect from him. You don't need a crystal ball to know what to expect from Mr. Romero in the future." The prosecutor subsequently argued: "Look at how he acted when he was free. He murdered people. When he had everything to lose, he murdered people. Look at how he acted in the jail when he had this trial pending and he had something to lose. How is he going to act when he has nothing left to lose, when he has got LWOP and they can't do anything else to him? It's an American Express card for violence." The prosecutor also noted that Romero would come into contact with "nurses, clerks, guards, counselors, [and] other inmates," and said: "[W]hat we know about him is that he likes to hurt people. The best predictor of the future is the past. He has 30, 40, 50 years of victims ahead of him if he has an LWOP, if he has life without parole." The

58

prosecutor also said, "Consider 50 years of what you have seen of the last three years. Don't let the price of your compassion be another victim."

On appeal, Romero expressly does not challenge admission of his statement to Stinson. Rather he contends that the prosecutor deceived the trial court by successfully seeking admission of the statement to rehabilitate Thibedeau's credibility and then using the statement instead to improperly argue future dangerousness and urge the jury to consider an aggravating factor not listed in section 190.3.

Romero cites no authority for the novel proposition a prosecutor commits misconduct during closing argument by drawing a reasonable inference from properly admitted evidence if he did not mention the inference at the time admissibility was sought. Rather, the crux of Romero's claim is that future dangerousness is an aggravating factor not listed in section 190.3 and therefore improperly relied on by a prosecutor during argument. Romero correctly notes this court has never delineated why there is no conflict between the circumstance that section 190.3 sets forth an exclusive list of aggravating factors, not expressly including future dangerousness, and our line of cases holding "[p]rosecutorial argument regarding a capital defendant's future dangerousness is permissible if . . . it is based on evidence of the defendant's conduct rather than expert opinion." (*People v. Thomas* (2011) 52 Cal.4th 336, 364.) We now do so.

The circumstances of a defendant's crimes, his unadjudicated violent conduct, and his violent conduct underlying a prior conviction, are aggravating factors under section 190.3, factors (a), (b), and (c). (*People v. Homick* (2012) 55 Cal.4th 816, 889.) A prediction that a defendant will be dangerous in the future based on evidence admitted under factors (a)–(c) is not itself a fact or an aggravating factor. It is an inference drawn from the aggravating evidence, and is properly argued by a prosecutor and considered by the jury in making its penalty determination. (See *People v. Ervine* (2009) 47 Cal.4th 745, 797 [if the jury interpreted the trial court instruction "to mean that 'no evidence was

59

introduced regarding the defendant's propensity to violence if in prison because the defendant's propensity for violence in prison is irrelevant,' then it would have failed to consider a relevant consideration in selecting the penalty"].)  As the high court has recognized, " 'any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.' " (*California v. Ramos* (1983) 463 U.S. 992, 1002.)  And as the Attorney General observes, our cases stand "for the unsurprising proposition that the prosecution may make reasonable inferences from properly admitted evidence to argue for imposition of the death penalty."[19]

" '[W]e have held that at the penalty phase of a capital case the prosecutor may not introduce expert testimony forecasting that, if sentenced to life without the possibility of parole, a defendant will commit violent acts in prison . . . .' " (*People v. Michaels* (2002) 28 Cal.4th 486, 540.)  "[T]here is a significant difference between an inference which a juror may or may not draw and a direct expression of expert opinion.  The expert's authority and experience may persuade the jurors to a conclusion they would not reach on their own." (*People v. Lucero* (1988) 44 Cal.3d 1006, 1029.)

Accordingly, the prosecutor's argument here did not urge the jury to consider an aggravating factor not listed in section 190.3.  Rather, the prediction of future dangerousness was supported by the evidence, properly argued by the prosecutor, and properly considered by the jury.

---

[19]     In *Lucas, supra*, 60 Cal.4th at p. 321, we stated, "The trial court properly refused defendant's instruction that possible belief or predictions about a defendant's future dangerousness are not to be considered for any purpose because the standard jury instructions do not permit 'the jury to believe defendant's future dangerousness could be an aggravating factor.' "  An instruction such as that requested in *Lucas* would be inappropriate because the jury *may* consider a defendant's future dangerousness.  To the extent *Lucas* could be read to mean a jury may not consider a defendant's future dangerousness, it is disapproved.  (*Lucas, supra*, 60 Cal.4th 153.)

60

### 4. Asserted instructional error

#### a. *Victim impact*

Defendants contend the trial court erroneously refused to give a limiting instruction regarding the victim impact evidence. We disagree.

Defendants requested the court instruct the jury: "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy." The trial court denied the request, finding the proposed instruction was argumentative, a misstatement of the law, and duplicative. We have previously concluded that a substantially similar instruction was "argumentative" (*Hartsch, supra*, 49 Cal.4th at pp. 510–511) and "misleading to the extent it indicates that emotions may play no part in a juror's decision to opt for the death penalty" (*Zamudio, supra,* 43 Cal.4th at p. 368). "We have also held that the standard instructions given here, including CALJIC No. 8.85, adequately convey to the jury the proper consideration and use of victim impact evidence."[20] (*People v.*

---

[20] As we have observed, "CALJIC now includes a standard instruction explaining the permissible use of victim impact evidence consistent with our case law: 'Victim impact evidence has been received in this trial for the purpose of showing, if it does, the financial, emotional, psychological or physical effects of the victim's death on the family and friends of the victim[s]. You may consider this evidence as part of the circumstances of the crime in determining penalty. Your consideration must be limited to a rational inquiry, and must not be simply an emotional response to this evidence. These witnesses are not permitted to offer any opinion as to what is the appropriate penalty in this case.' (CALJIC No. 8.85.1 (Spring 2010 new) (Spring 2014 ed.) . . . ." (*People v. Boyce* (2014) 59 Cal.4th 672, 689, fn. 11.)

*Williams* (2013) 56 Cal.4th 165, 197.) Defendants cite no persuasive reason to revisit these conclusions.

### b. *Coperpetrator's sentence*

Romero contends the trial court erroneously refused to instruct the jury it could consider Munoz's sentence as a mitigating factor. "We have consistently held that evidence of an accomplice's sentence or of the leniency granted an accomplice is irrelevant at the penalty phase because ' "it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition." ' [Citations.] Nothing in *Parker v. Dugger* (1991) 498 U.S. 308, relied on by defendant, compels a different result." (*People v. Maciel* (2013) 57 Cal.4th 482, 549.) Moreover, the court permitted counsel to remind the jury of Munoz's sentence so long as he did not "compare it to what the defendants could possibly receive as a sentence in this case."

### c. *Reasonable doubt*

Romero challenges the reasonable doubt instruction on the same grounds as in the guilt phase. (See *ante*, pp. 45–47.) We reject the claim for the same reasons stated above.

### d. *Challenge to CALJIC No. 8.87*

Romero contends instruction in the language of CALJIC No. 8.87[21] was unfairly one-sided, implied a unanimity requirement for mitigating evidence, and directed a verdict on whether the unadjudicated criminal conduct was violent. We have repeatedly

---

[21] The court instructed the Romero jury that evidence had been introduced to show Romero had committed "assault, battery, robbery, attempted escape by force or violence, and possession of a deadly weapon in jail." It then instructed the jury: "Before a juror may consider any of such criminal acts or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant Romero did in fact commit such criminal acts or activity. . . . It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."

rejected similar challenges, and do so again here. (*People v. Moore* (2011) 51 Cal.4th 1104, 1139–1140 [instruction regarding lack of unanimity requirement for mitigating evidence not required, nor does the prosecution receive preferential treatment in the absence of such an instruction]; *People v. Nakahara* (2003) 30 Cal.4th 705, 720 ["CALJIC No. 8.87 is not invalid for failing to submit to the jury the issue whether the defendant's acts involved the use, attempted use, or threat of force or violence"].) Moreover, following the court's instructions to the Romero jury, Romero's counsel indicated only Self requested (and received) an instruction providing, "There is no need for the jurors to unanimously agree on the presence of a mitigating factor before considering it."

### e. Challenge to CALJIC No. 8.88

Defendants challenge the court's instruction in the language of CALJIC No. 8.88 on grounds we have repeatedly rejected. Contrary to their assertion, the language "so substantial" and "warrants" in that instruction is not impermissibly vague. (*People v. Dement* (2011) 53 Cal.4th 1, 56 (*Dement*).) "The instruction is not constitutionally flawed because it fails to inform the jury that if it determines the mitigating factors outweigh the aggravating factors, it is required to return a sentence of life imprisonment without the possibility of parole." (*Ibid*.)

### 5. Constitutionality of the death penalty statute

Defendants contend California's death penalty statute and implementing instructions are constitutionally invalid in numerous respects. We have repeatedly rejected similar claims, and defendants provide no persuasive reason to revisit our decisions.

We "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death . . . ." (*Dykes, supra*, 46 Cal.4th at p. 813; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978.) "[T]he death penalty statute is not unconstitutional because it does not require

63

'unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.' [Citation.] Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard. [Citations.] No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof." (*Dement, supra*, 53 Cal.4th at p. 55.) The trial court need not instruct there is a presumption in favor of a sentence of life imprisonment without the possibility of parole. (*People v. Adams* (2014) 60 Cal.4th 541, 581.)

The trial court was not required to "delete inapplicable factors from CALJIC No. 8.85" (*People v. Watson* (2008) 43 Cal.4th 652, 701) or "instruct that the jury can consider certain statutory factors only in mitigation" (*People v. Valencia* (2008) 43 Cal.4th 268, 311). "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.) The jury may properly "consider a defendant's unadjudicated criminal activity." (*People v. Martinez* (2010) 47 Cal.4th 911, 968.) "Use of the adjectives 'extreme' and 'substantial' in section 190.3, factors (d) and (g) is constitutional." (*Dement, supra*, 53 Cal.4th at p. 57.)

" 'The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal.' [Citations.] Moreover, 'capital and noncapital defendants are not similarly situated and therefore may be treated differently' [as to written jury findings, unanimity on aggravating factors, and the use of unadjudicated criminal activity] without violating' a defendant's right to equal protection of the laws, due process of law, or

freedom from cruel and unusual punishment." (*People v. Carrasco* (2014) 59 Cal.4th 924, 971; see *Capistrano*, *supra*, 59 Cal.4th at p. 881.)

Defendants contend their death sentences violate international law and therefore their rights under the Eighth and Fourteenth Amendments to the federal Constitution. They point to no authority "prohibit[ing] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*Hillhouse, supra*, 27 Cal.4th at p. 511.)

## 6. Cumulative prejudice

Defendants contend the cumulative effect of guilt and penalty phase errors requires us to reverse the judgments. We have found error only in Self's conviction for the robbery of Albert Knoefler and the duplicative multiple-murder special-circumstance findings for both defendants, and where we have assumed error regarding the admission of evidence of Feltenberger's attempted murder before Romero's jury and the escape instructions given to Romero's jury we have concluded there was no prejudice. We further conclude this error and any assumed error are not prejudicial when considered cumulatively.

65

## DISPOSITION

For the reasons set forth above, we reverse Self's conviction and sentence on count XV, the robbery of Albert Knoefler, vacate five multiple-murder special-circumstance findings for each defendant, and otherwise affirm the judgments.

**WERDEGAR, J.**


**WE CONCUR:**


**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Romero & Self
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S055856
**Date Filed:** August 27, 2015
_____

**Court:** Superior
**County:** Riverside
**Judge:** Ronald L. Taylor


_____

**Counsel:**

Michael P. Goldstein, under appointment by the Supreme Court, for Defendant and Appellant Orlando Gene Romero.

William D. Farber, under appointment by the Supreme Court, for Defendant and Appellant Christopher Self.

Edmund G. Brown., Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Ivy B. Fitzpatrick and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael P. Goldstein
P.O. Box 30192
Oakland, CA 94604
(510) 910-7220

William D. Farber
369-B Third Street, #164
San Rafael, CA 94901
(415) 472-7279

Theodore M. Cropley
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 645-2286