Filed 3/5/26  P. v. Blake CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br> v. <br> RITCHIE LEE BLAKE, <br><br> Defendant and Appellant. | A172358 <br><br> (Humboldt County <br> Super. Ct. No. 7075) |

This is the third appeal brought by defendant Ritchie Lee Blake after he was convicted by jury of first degree murder (Pen. Code, § 187),[1] kidnapping (§ 207), and burglary (§ 459), and sentenced to life in prison without the possibility of parole.[2]  In this appeal, he challenges the trial court's order denying his petition for resentencing under section 1172.6 following an evidentiary hearing.  Defendant contends the evidence was insufficient to support the trial court's finding that he was the actual killer, and thus ineligible for resentencing, because the finding was based on uncorroborated accomplice testimony.  We affirm the order.

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     We granted defendant's request to take judicial notice of the record filed in his first appeal, *People v. Blake* (Oct. 15, 1975, No. 1 Crim. 13249) (nonpub. opn.) (*Blake I*).

1

## BACKGROUND

**The Evidence at Trial**

On January 12, 1973, the Humboldt County Sheriff's Office was informed by Arnold Ferris, manager of the Club Hupa and Club Hupa Liquors, that one of its janitors, Gerald Marshall, was missing. On January 22, Marshall's body was found. The cause of death was a gunshot wound to the head.

### *Accomplice Testimony*

Defendant's accomplices, Milton Dowd, Gaylord Dowd,[3] and Matthew James, provided the following testimony regarding the killing.

#### Milton Dowd

Milton testified that late in the morning or the early afternoon of January 10, 1973, he went to defendant's home. About two hours later, James arrived in his car. The three men spent the afternoon drinking whiskey. While at defendant's home, Milton saw defendant had a .22-caliber, scoped-rifle.

After some time had passed, defendant, James, and Milton drove to Club Hupa, a club with an attached store that also sold alcohol, to buy more alcohol. Defendant brought the rifle in the car. Defendant went into the store and purchased more whiskey. The three men then drove around, drinking whiskey while doing so. They ended up at the home of Milton's sister and brother-in-law, where they played pool. Milton's brother, Gaylord, and another friend, met them at the house. The other friend soon left, and defendant, Milton, Gaylord, and James continued to drink and play pool.

Around midnight, defendant left to buy more whiskey. Defendant

---

[3]     Milton and Gaylord Dowd are brothers. To avoid confusion, we refer to them by their first names.

returned a short while later without alcohol, however, as Club Hupa was closed. Defendant suggested that the group go together to Club Hupa and break in to steal some alcohol. The men brought the gun in the car with them.

When they arrived at Club Hupa, they saw Gerald Marshall, who worked at Club Hupa, burning some trash in a barrel outside the building. Defendant talked to Marshall while Gaylord went through the back door of the building and took some alcohol.

Milton and James exited the car and went inside the building to take more alcohol. Milton and James made three additional trips inside the building to take alcohol. When they came out of the building a final time, Milton noticed that Marshall was in the back seat of the car and that the rifle was leaning against the car. Milton, Gaylord, and James got into the car with Marshall. Defendant closed the door to the building, grabbed the rifle, and got into the back seat next to Marshall.

James drove the group up to the Bald Hills area. At around 1:30 A.M., James stopped on a skid road used for logging, and everyone got out of the car. Defendant, Milton, Gaylord, and James walked up the road to stash some beer in the bushes, and Marshall followed behind. It was dark, and James repositioned the car so that the headlights illuminated the area where the group was walking. Milton and Marshall went further up the skid road with defendant trailing behind Marshall.

When Milton started to hide the beer in some bushes, he heard two shots. He also heard Gaylord yelling at him to come back to the car. As Milton ran back toward the car, he saw Marshall fall to the ground. At the same moment, defendant stepped out of the dark, holding the rifle. Defendant walked toward where Marshall laid, and Milton continued toward

3

the car. As he got into the car, he heard an additional gunshot. That gunshot was not as loud, and sounded more muffled, than the previous shots.

Defendant returned to the car, and the group drove away, leaving Marshall lying on the road. Defendant stated that he had a reason for shooting Marshall, but he did not say what it was. The men drove to a different area and stashed the remaining alcohol before eventually driving to Eureka.

### Gaylord Dowd

Gaylord and Milton were defendant's cousins. On the evening of January 10, 1973, Gaylord met Milton, defendant, and James at his sister's and brother-in-law's house. The four men played pool and drank whiskey. At some point, they ran out of whiskey and defendant left to buy more. He returned a short time later without any alcohol, apparently because Club Hupa was closed. Defendant suggested that they go take alcohol from Club Hupa, and the other men agreed. On the way to Club Hupa, they stopped by defendant's house where defendant retrieved the rifle.

When they arrived at Club Hupa, Marshall was standing behind the building, attempting to light a fire in a trash-burning barrel. The men talked with Marshall for a few minutes, and Gaylord went into the building and took some alcohol. Marshall tried to stop him as he left, but Gaylord pushed him away. Gaylord took the gun from defendant and stood guard over Marshall while the other men continued to take alcohol from inside the building. Among the alcohol taken were cases of Coors beer.

When they were finished, Gaylord told Marshall to get into the car and handed the gun back to defendant. The other men got into the car, and they drove to the Bald Hills area to stash the stolen alcohol.

They drove up an old logging road and got out of the car. Milton went

4

first, followed by Marshall, and then defendant, who was carrying the rifle. At some point, defendant pointed the rifle in the direction of Milton and Marshall. Worried that defendant might start firing, Gaylord warned defendant that Milton was ahead near Marshall. Gaylord turned to walk back toward the car, at which point he heard a single gunshot. Milton and defendant soon walked back to the car. Defendant was holding the gun. The four men got into the car and quickly left. Defendant said, "I'll take the rap" for the shooting. They then drove to Tish Tang Road and stashed the alcohol.

### Matthew James

On the afternoon of January 10, 1973, James drove his car to defendant's home. Milton and defendant were there, and the three of them drank a bottle of whiskey and smoked marijuana. The three men left and drove around for a while, before returning to defendant's home. James saw the rifle in defendant's car.

That evening, the three men went to Milton's sister's home, where they met Gaylord, played pool, and drank more whiskey. After the group finished a bottle of whiskey, defendant left to buy more alcohol at Club Hupa. He returned a short while later, having been unable to obtain any alcohol. Defendant then asked them if they wanted to go to Club Hupa to take some alcohol, and they agreed. James drove them to Club Hupa, with the rifle in the car.

When the group arrived at Club Hupa, they encountered Marshall, who worked at the club. Gaylord started punching Marshall. Gaylord then went inside the building and took some alcohol, put the alcohol in the car, then stood near Marshall while holding defendant's gun. James and Milton also exited the car and went inside the building to take alcohol.

James returned to and went inside the car, and soon after Marshall did

5

too. When the two were alone in the car, Marshall told James that "he didn't want to die or something like that." The other men got into the car and the group drove to the Bald Hills area to stash the alcohol, with the rifle in the car.

They stopped at a skid road. They all got out and headed up the skid road with Milton and Marshall out in front. Gaylord, defendant, and James watched as Milton and Marshall looked for a place to hide the alcohol off of the skid road.

Defendant had the gun and began aiming it in the direction of Milton and Marshall. Gaylord yelled for Milton to come back towards the car. After Milton walked back, James heard two gunshots and saw Marshall fall to the ground. James saw defendant walk towards where Marshall was lying on the ground. James heard two more gunshots. These gunshots sounded different than the first two. They sounded "like a pop gun or something."

Defendant returned to the car holding the gun. As the men drove away, defendant admitted that he had shot Marshall and said it was "just like shooting a dog or a cat." Defendant also said that he had to shoot Marshall because defendant was "afraid [Marshall] might squeal on him."

### *Non-Accomplice Evidence*

Arnold Ferris, the manager of Club Hupa, testified that when he arrived at the club on the morning of January 11, 1973, he noticed that alcohol and cigarettes were missing, and that there was no sign of Marshall. Among the items taken were several cases of Coors beer. Ferris went to Marshall's trailer, but there was no answer. He also called Marshall's mother, but she did not know where Marshall was. Ferris then reported the burglary and Marshall's disappearance to the Humboldt County Sheriff.

On January 22, 1973, sheriff's deputies interviewed Gaylord in

6

connection with the burglary and the disappearance of Marshall. Gaylord led the deputies to Marshall's body. Deputies discovered a .22-caliber shell near the body. Deputies also searched the crime scene area and discovered Coors beer can cartons.

Daniel Colegrove, a friend of defendant and of Marshall, helped Marshall's parents search for him on January 22, 1973. Colegrove was searching near the old logging road in the Bald Hills area, when the deputies brought Gaylord to the scene, and Gaylord led them to the body. Colegrove heard the deputies say that Milton and Gaylord had turned themselves into the sheriff's office, and that they were looking for defendant in connection with the murder.

Colegrove went to defendant's residence and told him that the deputies were looking for him. Later that evening, defendant showed up at Colegrove's house. Defendant was scared that the police were going to come after him and try to kill him.

Defendant stayed at Colegrove's house for approximately one week. While he was staying with Colegrove, defendant told him that he was present when Marshall was killed, but claimed that James was the one who had shot Marshall. Defendant also told Colegrove that he knew that the Humboldt County Sheriff's Office was looking for him, and that he did not want to go to jail.

Colegrove also testified that he had seen a .22-caliber rifle at defendant's house. Also, at some point on the date of the murder, Colegrove saw defendant, Milton, Gaylord, and James together in a car driving past his house and in the direction of Bald Hills Road.

The pathologist who performed the autopsy on Marshall testified his cause of death was a gunshot wound to the head. Marshall had suffered

three gunshot wounds. One of the wounds was to his chest, one was above his left eye, and a third and likely fatal gunshot wound was to the back of his head. The gunshot to the back of Marshall's head was fired with the gun in direct contact with, or very close proximity to, his head, leaving burned and charred skin near the entry wound.

**The Verdict and Original Sentence**

In 1974, a jury found defendant guilty of first degree murder (§ 187), kidnapping (§ 207), and burglary (§ 459). The trial court sentenced him to life without the possibility of parole for the murder and stayed execution of the sentence for the remaining offenses.

In defendant's first appeal, Division One of this court affirmed the judgment of conviction. (*Blake I*, *supra*, 1 Crim. 13249.)

**The Petition for Resentencing**

In 2022, defendant petitioned for resentencing pursuant to what is now section 1172.6 (former section 1170.95), arguing he could no longer be convicted of first degree murder given the legislative changes to murder liability.

The trial court denied the petition at the prima facie stage, but on appeal, this court reversed, concluding that there was a factual question as to defendant's liability for murder. We therefore remanded the matter to the trial court with directions to issue an order to show cause and hold an evidentiary hearing. (*People v. Blake* (Sept. 26, 2023, A166459) [nonpub. opn.] (*Blake II*).)

The trial court heeded these directions. At the evidentiary hearing on September 24, 2024, the prosecution relied on the record of conviction, including the original trial transcripts, and both parties presented argument. The prosecution argued that the trial testimony established beyond a

reasonable doubt that defendant was the actual killer. The defense argued among other things that the testimony of defendant's accomplices implicating him in the murder was not corroborated by independent evidence.

On December 23, the court denied the petition by written order. The court found that the People had proven beyond a reasonable doubt that defendant was guilty of first degree murder as the actual killer and thus ineligible for relief under section 1172.6.

In so finding, the court rejected defendant's assertion that the trial testimony of his accomplices was not sufficiently corroborated. The court explained: "In this case, Daniel Colegrove was not an accomplice to the burglary of Club Hupa, the kidnapping of Gerald Marshall, nor Marshall's murder. He testified that Defendant told him Defendant was present when Marshall was murdered, that Defendant knew that the Humboldt County Sheriff's Office was looking for him and that he was afraid to go to jail. This testimony is sufficient corroboration of the testimony of Milton, Gaylord, and James to connect Defendant to the burglary of Club Hupa, Marshall's kidnapping, and Marshall's murder." The court found other corroborative evidence, including that a deputy had found "a .22 caliber shell near Marshall's body on skid road," which the court explained, "corroborat[ed] Milton's testimony that the rifle was a .22 caliber." The court added that the pathologist's "autopsy results confirmed that the fatal shot was close to the back of Marshall's head, corroborating both Milton's testimony that the final shot was muffled and James's testimony that the final shot sounded like a cap gun— i.e. it was not as loud as the other shots." (*Ibid.*)

This appeal followed.

9

## DISCUSSION

### The Section 1172.6 Process

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which amended sections 188 and 189 to significantly limit the scope of the felony-murder rule and eliminate second degree murder liability predicated on the natural and probable consequences doctrine. (*People v. Curiel* (2023) 15 Cal.5th 433, 448–449; *People v. Strong* (2022) 13 Cal.5th 698, 707–708 & fn. 1.) Among other things, Senate Bill 1437 added section 189, subdivision (e), which specifies that a "participant in the perpetration or attempted perpetration of a [specified] felony . . . in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 3, subd. (e).)

Senate Bill 1437 also created "a special procedural mechanism for those convicted under the former law to seek retroactive relief," codified at what is now section 1172.6. (*People v. Strong, supra,* 13 Cal.5th at p. 708 & fn. 2.) If the trial court finds that a petitioning defendant has made a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subds. (c) & (d); *People v. Curiel, supra,* 15 Cal.5th at p. 450.)

At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the

10

changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

Effective January 1, 2022, Senate Bill No. 775 (2020–2021 Reg. Sess.) clarified that the rules of evidence apply to evidentiary hearings held under section 1172.6, subdivision (d)(3). (Stats. 2021, ch. 551, §§ 1, 2; § 1172.6, subd. (d)(3).)

**The Trial Court Properly Denied the Section 1172.6 Petition**

Defendant argues the trial court erred in denying his petition for resentencing because there was insufficient evidence to support its finding that he was guilty of murder under the current law as the actual killer. Specifically, defendant contends the trial court's decision was based on the uncorroborated testimony of Milton, Gaylord, and James, his accomplices in the murder. We disagree.

### *Applicable Law*

Section 1111 provides, in part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." "Section 1111 serves to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives." (*People v. Davis* (2005) 36 Cal.4th 510, 547.)

To be sufficient, corroborating evidence must, " ' "without aid from the accomplice's testimony, tend[ ] to connect the defendant with the crime." ' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).) Corroborating evidence " ' "may be slight, entirely circumstantial or slight, and entitled to little consideration when standing alone." ' " (*Ibid.*; see *People*

11

*v. Trujillo* (1948) 32 Cal.2d 105, 111 ["The prosecution is not required to single out an isolated fact which in itself, unrelated to other proven facts, is considered to be sufficient corroboration.  It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supplies the test."].)  The corroborating evidence "must tend to implicate the defendant by relating to an act that is an element of the crime" (*People v. McDermott* (2002) 28 Cal.4th 946, 986), but "does not need to independently prove guilt." (*People v. Hall* (2024) 104 Cal.App.5th 1077, 1092; accord, *People v. Negra* (1929) 208 Cal. 64, 70 ["It is not necessary that the corroborating evidence should go so far as to establish . . . that the defendant committed the offense charged."].)  Further, "[t]he evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies." (*Romero and Self*, *supra*, 62 Cal.4th at p. 32.)  "It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the [trier of fact] that the accomplice is telling the truth.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 147–148 (*Valdez*).)

"The requirement that accomplice testimony be corroborated is an ' " exception[ ]" ' to the substantial evidence' rule.  [Citation.]  It is based on the Legislature's determination that ' "because of the reliability questions posed by" ' accomplice testimony, such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' " (*Romero and Self*, *supra*, 62 Cal.4th at p. 32.)  "For this reason, '[t]he trier of fact's determination on the issue of corroboration' is not binding on the reviewing court if the 'corroborating evidence . . . does not reasonably tend to connect the defendant with the commission of the crime.' " (*People v. Dalton* (2019) 7 Cal.5th 166, 245.)

### *Independent Evidence Corroborated the Accomplice Testimony*

We agree with the Attorney General that the totality of the evidence independent of the accomplices' testimony tended to connect defendant to Marshall's murder and permitted the trial court to find the accomplices were telling the truth.

As discussed, Daniel Colgrove, a friend of defendant and Marshall, testified he saw defendant, together with Milton, Gaylord, and James, drive by in a vehicle on the day of the murder in the direction of Bald Hills Road, which is where Marshall's body was discovered. Beyond that, Colgrove testified that defendant admitted that he was with Milton, Gaylord, and James when Marshall was killed, and knew that Marshall was killed by being shot with a gun (though claiming James was the shooter). Thus, by defendant's own admissions, he was present at the time of the murder and knew the manner in which the murder was committed. (See *People v. Williams* (1997) 16 Cal.4th 635, 680 ["The necessary corroborative evidence for accomplice testimony can be a defendant's own admissions"]; see also *People v. Medina* (1974) 41 Cal.App.3d 438, 466 [defendant's presence at crime scene, though "not in and of itself sufficient corroboration" under section 1111, may be sufficient in combination with other evidence].)

Evidence that further corroborated the accomplice testimony was Colgrove's testimony that when defendant heard that Marshall's body had been discovered and that he was a potential suspect, defendant fled and hid in Colegrove's trailer for several days. (See *People v. Garrison* (1989) 47 Cal.3d 746, 773 ["evidence of flight supports an inference of consciousness of guilt and constitutes an implied admission which may properly be considered as corroborative of an accomplice's testimony"], citing *People v. Perry* (1972) 7 Cal.3d 756, 771–772.)

There is more. Colgrove testified that he saw a .22-caliber rifle at defendant's house, the same type of caliber of a spent casing that sheriff's deputies found near Marshall's body. This evidence corroborated Milton's testimony that defendant possessed and used a .22-caliber rifle on the night in question. (See *Romero and Self, supra*, 62 Cal.4th at p. 34 [" 'Possession of a gun similar to that used in the commission of the crime has been deemed competent corroborative evidence' "]; *People v. Trujillo, supra*, 32 Cal.2d at pp. 111–112 [accomplice testimony corroborated in part by evidence the bullet that killed the victim could have come from the gun the defendant admitted was in his possession before the crime and which was found in his room after his arrest].)

In addition, the testimony of the pathologist who performed Marshall's autopsy corroborated the accomplices' descriptions of the shooting. The pathologist testified that the autopsy results revealed that Marshall was shot multiple times, and that the one, fatal shot was made in close-range to the back of his head. This evidence corroborated Milton's and James's testimony that they heard two shots and saw Marshall fall down, and that they heard at least one additional shot that was not as loud as the previous shots, in that it sounded muffled or "like a pop gun." (Cf. *People v. Lewis* (2001) 26 Cal.4th 334, 370–371 [accomplice's testimony corroborated in part because his "description of how [the victim's] murder took place was corroborated by the pathologist"].)

We conclude that the above pieces of evidence, while circumstantial, slight, or entitled to little consideration when standing alone, together " 'tend[ed] to connect the defendant with the crime in such a way as to satisfy the [trier of fact] that the accomplice is telling the truth.' " (*Valdez, supra,* 55 Cal.4th 82, 147–148.)

14

Defendant's arguments to the contrary are unpersuasive. Although he acknowledges the independent evidence described above, he argues that "[n]one of the above evidence . . . corroborated that [he] was the actual killer." But that is not required for evidence to be sufficient under section 1111. As noted above, the corroborating "evidence 'need not independently establish the identity of the victim's assailant . . . .' " (*Romero and Self*, *supra*, 62 Cal.4th at p. 31) or "that the defendant committed the offense charged" (*People v. Negra, supra,* 208 Cal. at p. 70).

In a similar vein, defendant argues that evidence of his flight after law enforcement discovered Marshall's body and were looking for defendant "proves only consciousness of guilt that the defendant has committed a crime[,] but is not proof of the elements of the charged crime." This argument again misses the mark. We already explained that the corroborating evidence does not need to independently prove guilt. (*People v. Hall, supra,* 104 Cal.App.5th at p. 1092; accord, *People v. Negra, supra,* 208 Cal. at p. 70.) It is only defendant's *connection with* the murder that must be corroborated in accordance with section 1111. (See *Valdez, supra,* 55 Cal.4th at pp. 147–148.) And as our Supreme Court has explained, "The law is settled that 'evidence of flight supports an inference of consciousness of guilt and constitutes an implied admission.' [Citation.] Flight tends to connect an accused with the commission of an offense and may indicate that an accomplice's testimony is truthful." (*People v. Perry, supra*, 7 Cal.3d at pp. 771–772; accord, *People v. Garrison, supra,* 47 Cal.3d at p. 773.)

Finally, defendant argues, "the trial court erred when it relied on the lack of evidence that the three accomplices 'conspire[d] together to implicate Defendant in Marshall's death.' " Defendant contends, "[t]he trial court's suggestion that the three accomplices were truthful because they had no

15

reason to conspire to implicate [him] is tantamount to using the testimony of each accomplice to corroborate the testimony of the others." This argument takes the trial court's findings out of context. When read in proper context, the court's comment in its order—that "there was no evidence of any scheme between Milton, Gaylord, and James to conspire together to implicate Defendant in Marshall's death"—was in response to defendant's alternative argument that "even if there is evidence to corroborate [the accomplices'] testimony, the evidence is insufficient because they were too biased to be believed . . . ." Thus, contrary to defendant's assertion, the court did not rely on the lack of evidence of a "scheme" among the accomplices as a basis to find the accomplices' testimony sufficiently corroborated under section 1111.

In sum, independent evidence sufficiently corroborated the accomplice testimony. Therefore, there was sufficient evidence to support the trial court's finding that defendant was the actual killer and thus ineligible for relief under section 1172.6.[4]

## DISPOSITION

The order denying the petition for resentencing is affirmed.

---

[4] We reject defendant's alternative arguments that "the independent evidence failed to prove beyond a reasonable doubt that [he] aided and abetted with reckless indifference to human life" and that he "aided and abetted" with the intent to kill. The People did not argue, and the trial court did not find, defendant was guilty of murder under those alternative theories of liability.

16

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

(A172358N)

17